*414 JUSTICE ALBIN
delivered the opinion of the Court.
In this appeal, we are called on to determine whether the constitutional standard governing an automobile search in State v. Pena-Flores, 198 N.J. 6, 965 A.2d 114 (2009) is unsound in principle and unworkable in practice.
In Penar-Flores, supra, 198 N.J. at 28, 965 A.2d 114, a deeply divided Court reaffirmed its departure from the standard for automobile searches set forth in State v. Alston, 88 N.J. 211, 233, 440 A.2d 1311 (1981). In Alston, we determined that a warrant-less search of an automobile was constitutionally permissible, provided that the police had probable cause to search the vehicle and that the police action was prompted by the “unforeseeability and spontaneity of the circumstances giving rise to probable cause.” Id. at 233, 235, 440 A.2d 1311. The Alston standard was seemingly consistent with the federal exception to the warrant requirement.
In State v. Cooke, 163 N.J. 657, 670, 751 A.2d 92 (2000), invoking our State Constitution, the Court overthrew the Alston standard and added a pure exigent-circumstances requirement to justify an automobile search. Pena-Flores maintained the course charted by Cooke. Pena-Flores also set forth a multi-factor test to guide police officers in determining whether exigent circumstances excused the securing of a warrant and encouraged the use of telephonic warrants as a means of shortening roadway stops. The Court expected that its exigent-circumstances test would provide a reliable guide to law enforcement and that telephonic warrants would present an efficient and speedy way of curbing prolonged roadway stops. Those expectations have not come to pass.
Experience and common sense persuade us that the exigent-circumstances test in Pena-Flores does not provide greater liberty or security to New Jersey’s citizens and has placed on law enforcement unrealistic and impracticable burdens. First, the multi-factor exigency formula is too complex and difficult for a reasonable police officer to apply to fast-moving and evolving events that require prompt action. Thus, we cannot expect pre *415 dictable and uniform police or judicial decision-making. Second, the securing of telephonic warrants results in unacceptably prolonged roadway stops. During the warrant-application process, the occupants of a vehicle and police officers are stranded on the side of busy highways for an extended period, increasing the risk of serious injury and even death by passing traffic. If the ear is impounded, then the occupants’ detention will be extended for an even longer period as a warrant is procured. Third, one of the unintended consequences of Pena-Flores is the exponential increase in police-induced consent automobile searches. The resort to consent searches suggests that law enforcement does not consider time-consuming telephonic warrants or the amorphous exigent-circumstances standard to be a feasible answer to roadway automobile searches. The heavy reliance on consent searches is of great concern given the historical abuses associated with such searches and the potential for future abuses.
Adherence to stare decisis serves a number of salutary purposes, including promoting certainty and stability in our law. However, stare decisis is not a command to continue on a misguided course or to hold tight to a failed policy. We do not overturn precedent lightly, and certainly not without good cause or a special justification. Because we believe that good cause and special justification are present here, we return to the standard that governed automobile searches in Alston — a standard that is more in line with the jurisprudence of most other jurisdictions, yet still protective of the right of citizens to be free from unreasonable searches.
I.
A.
Defendant William L. Witt was charged in an indictment with second-degree unlawful possession of a firearm, N.J.S.A. 2C:39-5(b), and second-degree possession of a weapon by a convicted person, N.J.S.A. 2C:39-7(b). The police initiated a stop of defen *416 dant’s car because he did not dim his high beams when necessary. A search of defendant’s vehicle uncovered a handgun.
Defendant moved to suppress the gun on the ground that the police conducted an unreasonable search in violation of the New Jersey Constitution. Defendant’s sole argument in support of his motion, presented both in a letter brief and oral argument to the trial court, was that the police did not have exigent circumstances to justify a warrantless search of his car under Pena-Flores. Defendant did not challenge the validity of the motor-vehicle stop.
At the suppression hearing, only one witness testified — Officer Joseph Racite of the Carneys Point Township Police Department. According to Officer Racite, at approximately 2:00 a.m. on December 19, 2012, while providing backup for a motor-vehicle stop on Pennsville Auburn Road, he observed a car pass with its high beams on. Officer Racite explained that a car must dim its high beams “as vehicles approach.” Officer Racite pursued and stopped the vehicle, and requested backup. Defendant, the driver, appeared intoxicated and was asked to exit his car. After defendant failed to properly perform field-sobriety and balance tests, Officer Racite arrested him for driving while intoxicated. Defendant was handcuffed and placed in the back of a patrol car. While Racite searched defendant’s vehicle for “intoxicants,” he found a handgun in the center console.
With Pena-Flores as its guide, the trial court made the following findings: the officer had a right to stop defendant’s car based on an “unexpected” occurrence and had probable cause to search for an open container of alcohol, but did not have “sufficient exigent circumstances” to conduct a warrantless search. Accordingly, the court suppressed the handgun.
The Appellate Division granted the State’s motion for leave to appeal.
B.
The Appellate Division affirmed the trial court’s suppression of the gun “because of the utter absence of any exigency to support *417 the warrantless vehicle search that occurred, and because there was no justification for this motor vehicle stop.” State v. Witt, 435 N.J.Super. 608, 610-11, 90 A.3d 664 (App.Div.2014). First, the panel declined to address the State’s argument that the exigent-circumstances test in Pena-Flores “should be replaced because it has proved to be unworkable and has led to unintended negative consequences.” Id. at 612, 90 A.3d 664. The panel explained that, as an intermediate appellate court, it had “no authority to ‘replace’ Pena-Flores with some other legal principles.” Ibid.
Second, in applying Pena-Flores, the panel determined that the evidence at the suppression hearing did not “suggest[ ] anything close to an exigency that would permit a motor vehicle search without a warrant.” Id. at 613, 90 A 3d 664. It emphasized that the stop occurred in the early morning when defendant was driving alone; during the search, defendant was “handcuffed” and “seated in the back of a police vehicle”; and the police had no reason to believe that the object of the search — “open containers of alcohol” — would not still be in the car “once a warrant was obtained.” Ibid.
Third, the panel agreed with defendant’s argument, raised for the first time on appeal, that Officer Racite did not have a “reasonable and articulable suspicion” to stop defendant for violating N.J.S.A. 39:3-60 because the statute requires drivers to dim their high beams only when “ ‘approaching] an oncoming vehicle’ ” within five hundred feet. Id. at 614-16, 90 A.3d 664 (quoting N.J.S.A. 39:3-60). The panel reasoned that the officer’s vehicle was not an “oncoming vehicle” because it was parked when defendant drove by with active high beams. Id. at 615-16, 90 A.3d 664. Because the officer’s vehicle was not “in operation and in the lane of traffic opposite to” defendant’s ear, in the panel’s view, Officer Racite had no right to stop him. Ibid.
C.
We granted the State’s motion for leave to appeal. State v. Witt, 219 N.J. 624, 99 A.3d 829 (2014). We also granted the motions of the Association of Criminal Defense Lawyers of New *418 Jersey, the New Jersey State Bar Association, and the American Civil Liberties Union of New Jersey to participate as amici curiae.
II.
Before addressing the parties’ arguments on the constitutional standard governing the search of defendant’s vehicle, we dispose of his challenge to the lawfulness of the stop, which was raised for the first time before the Appellate Division. Defendant did not challenge the validity of the motor-vehicle stop under N.J.S.A 39:3-60 in either his brief or argument before the trial court. Defendant now claims that the mere filing of a motion to suppress under Rule 3:5 — 7(a) required the State “to justify every aspect of the warrantless search,” including the initial stop, which he did not challenge at the suppression hearing.
We reject defendant’s contention that the State must disprove issues not raised by the defense at a suppression hearing. Defendant’s approach would compel the State to cover areas not in dispute from fear that an abbreviated record will leave it vulnerable if the defense raises issues for the first time on appeal. Requiring the State to disprove shadow issues will needlessly lengthen suppression hearings and result in an enormous waste of judicial resources.
Rule 3:5-7(a) provides that “a person claiming to be aggrieved by an unlawful search and seizure ... may apply ... to suppress the evidence.” Defendant never “claimfed] to be aggrieved by an unlawful” stop. He only challenged the search of his ear. A prosecutor should not have to possess telepathic powers to understand what is at issue in a suppression hearing.
N.J.SA. 39:3-60, in pertinent part, prohibits a driver from using his high beams when he “approaches an oncoming vehicle within five hundred feet.” Based on a violation of that statute, Officer Raeite stopped defendant’s car. Because the defense did not question the validity of the stop at the suppression hearing, the record is barren of facts that would shed light on this issue. For example, the record only discloses that Officer Raeite was on the side of the road assisting as backup on a motor-vehicle stop when *419 defendant approached using his high beams. We do not know on which side of the road Officer Racite’s patrol car was positioned, whether Raeite was in his car facing defendant’s vehicle, and whether Racite’s car was operational. Importantly, no testimony was elicited whether any other cars were travelling in the opposite lane from defendant at the time because the issue was of no moment.
Generally, “the points of divergence developed in proceedings before a trial court define the metes and bounds of appellate review.” State v. Robinson, 200 N.J. 1,19, 974 A.2d 1057 (2009). Parties must make known their positions at the suppression hearing so that the trial court can rule on the issues before it. See ibid. For sound jurisprudential reasons, with few exceptions, “ ‘our appellate courts will decline to consider questions or issues not properly presented to the trial court when an opportunity for such a presentation is available.’ ” Id. at 20, 974 A.2d 1057 (quoting Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234, 300 A.2d 142 (1973)).
We conclude that it would be unfair, and contrary to our established rules, to decide the lawfulness of the stop when the State was deprived of the opportunity to establish a record that might have resolved the issue through a few questions to Officer Raeite. The trial court, moreover, was never called on to rule on the lawfulness of the stop. Under the circumstances, the Appellate Division should have declined to entertain the belatedly raised issue. We therefore reverse the Appellate Division and hold that the lawfulness of the stop was not preserved for appellate review.
We now turn to the parties’ arguments, which address whether this Court should continue to follow the standard for automobile searches set forth in Pena-Flores.
III.
A.
The State urges this Court to abandon the exigent-circumstances standard for automobile searches followed in Pena-Flores *420 and to return to the more traditional automobile exception to the warrant requirement articulated in Alston, which allows for the search of a vehicle based on probable cause arising from unforeseeable arid spontaneous circumstances. The State argues that the Alston test should be reinstated primarily because (1) the standard governing exigent circumstances under Pena-Flores is too subjective and therefore too susceptible to second-guessing in the judicial process; (2) the standard does not lead to uniform results in the court system; (3) the telephonic-warrant process extends the length of time of a roadway stop, endangering the police and vehicles’ occupants from passing traffic; (4) law enforcement has turned not to telephonic warrants — as the Court expected — but rather to consent searches, which have a checkered history in New Jersey; and (5) impounding a car to secure a warrant is a greater constitutional intrusion than a prompt search based on probable cause. In short, the State argues that Pena-Flores should be overturned.
B.
Defendant asserts that, given the doctrine of stare decisis, the State has failed to prove any “special justification” for overturning a well-grounded and well-reasoned recent precedent. Defendant submits that this Court should stand by Pena-Flores because: (1) the statistical evidence presented by the State suggests that “the system is working well” and will get even better “as the State ... trains all of its officers on the correct law”; (2) New Jersey’s jurisprudence expresses a preference for search warrants, and our “State Constitution provides greater protection than does its federal counterpart”; (3) the exigency rule is simple in concept and application — “get a warrant, unless circumstances are such that to do so would risk destruction of evidence, or the safety of officers or others”; (4) consent searches do not present a problem provided police officers only make the request when they possess reasonable suspicion; and (5) the exigency “analysis is not an excessive burden to a police officer,” and the Pena-Flores test for *421 exigency is not “substantively different than the test” discussed in Alston. Simply stated, the defense claims that the State has given no reason to depart from Penar-Flores.
C.
Echoing many of the arguments made by defendant, amici, the American Civil Liberties Union, Association of Criminal Defense Lawyers, and State Bar Association, individually and collectively, call on the Court to keep faith with Penar-Flores. They claim that the State has failed to establish statistically or otherwise any special circumstance for overthrowing the present exigent-circumstance requirement when a warrant to search a car is not procured. They note that advances in technology will allow more timely access to warrants. In addition, the State Bar rejects the notion that “consent searches may be inherently coercive” and finds that the increase in the number of such searches represents a “positive impact” of the Penar-Flores decision. The American Civil Liberties Union acknowledges that consent searches may be coercive but submits that “the potential abuse of consent searches by law enforcement” should not be the basis for excusing police officers from complying with the dictates of Penar-Flores and for allowing warrantless searches without either consent or exigency.
IV.
A.
A critical understanding of Pena-Flores requires that we review the jurisprudential rationales for the automobile-exception to the warrant requirement. Our starting point is the text of our State and Federal Constitutions.
In nearly identical language, Article I, Paragraph 7 of the New Jersey Constitution and the Fourth Amendment of the United States Constitution guarantee that “[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated” *422 and that warrants shall not issue in the absence of “probable cause.” N.J. Const, art. I, ¶ 7; U.S. Const, amend. IV. Our jurisprudence under both constitutional provisions expresses a preference that police officers secure a warrant before they execute a search. State v. Frankel, 179 N.J. 586, 597-98, 847 A.2d 561, cert, denied, 543 U.S. 876, 125 S.Ct. 108, 160 L.Ed.2d 128 (2004). Warrantless searches are permissible only if “justified by one of the ‘few specifically established and well-delineated exceptions’ to the warrant requirement.” Id. at 598, 847 A.2d 561 (quoting Mincey v. Arizona, 437 U.S. 385, 390, 98 S.Ct. 2408, 2412, 57 L.Ed.2d 290, 298-99 (1978)). One such exception is the automobile exception to the warrant requirement. Pennsylvania v. Labron, 518 U.S. 938, 940,116 S.Ct. 2485, 2487,135 L.Ed.2d 1031, 1036 (1996); see also Alston, supra, 88 N.J. at 230-31, 440 A.2d 1311 (citing Chambers v. Maroney, 399 U.S. 42, 51, 90 S.Ct. 1975, 1981, 26 L.Ed.2d 419, 428 (1970)).
The automobile exception to the warrant requirement— as defined by the United States Supreme Court in construing the Fourth Amendment — authorizes a police officer to conduct a warrantless search of a motor vehicle if it is “readily mobile” and the officer has “probable cause” to believe that the vehicle contains contraband or evidence of an offense. Labron, supra, 518 U.S. at 940, 116 S.Ct. at 2487, 135 L.Ed.2d at 1036. Under federal law, probable cause to search a vehicle “alone satisfies the automobile exception to the Fourth Amendment’s warrant requirement.” Maryland v. Dyson, 527 U.S. 465, 467, 119 S.Ct. 2013, 2014, 144 L.Ed.2d 442, 445 (1999). The federal automobile exception does not require “a separate finding of exigency in addition to a finding of probable cause,” ibid., as is the case in New Jersey, Pena-Flores, supra, 198 N.J. at 28, 965 A.2d 114.
The United States Supreme Court has identified three rationales for the current automobile exception: (1) the inherent mobility of the vehicle, Carroll v. United States, 267 U.S. 132,153, 45 S.Ct. 280, 285, 69 L.Ed. 543, 551 (1925); (2) the lesser expectation of privacy in an automobile compared to a home, California v. *423 Carney, 471 U.S. 386, 391-93, 105 S.Ct. 2066, 2069-70, 85 L.Ed.2d 406, 413-14 (1985); and (3) the recognition that a Fourth Amendment intrusion occasioned by a prompt search based on probable cause is not necessarily greater than a prolonged detention of the vehicle and its occupants while the police secure a warrant, Chambers, supra, 399 U.S. at 51-52, 90 S.Ct. at 1981, 26 L.Ed.2d at 428.
The first rationale is clearly expressed in Carroll, supra, the case in which the United States Supreme Court first recognized the automobile exception. 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543. There, the police stopped a ear believed to be used by “bootleggers” to smuggle alcohol in violation of the Prohibition laws. Id. at 160, 45 S.Ct. at 287, 69 L.Ed. at 554. The Court upheld the warrantless search because the police possessed probable cause and because “it [was] not practicable to secure a warrant” given that “the vehicle [could have been] quickly moved out of the locality or jurisdiction.” Id. at 153, 45 S.Ct. at 285, 69 L.Ed. at 551. The Court noted that, historically, Fourth Amendment jurisprudence had distinguished between searches of structures, such as a house, and readily moveable vehicles, such as a ship or automobile. Ibid.; see also Carney, supra, 471 U.S. at 390, 105 S.Ct. at 2069, 85 L.Ed.2d at 412 (stating that “capacity to be ‘quickly moved’ was clearly the basis of the holding in Carroll ”). Thus, the vehicle’s inherent mobility provided the exigency rationale for the exception to the warrant requirement. Carroll, supra, 267 U.S. at 153, 45 S.Ct. at 285, 69 L.Ed. at 551.
The second rationale is that, due to the pervasive governmental regulation of motor vehicles, an individual is afforded a lesser expectation of privacy in an automobile. Carney, supra, 471 U.S. at 391-93,105 S.Ct. at 2069-70, 85 L.Ed.2d at 413-14 (stating that “pervasive schemes of regulation ... necessarily lead to reduced expectations of privacy” in motor vehicles); Chambers, supra, 399 U.S. at 52, 90 S.Ct. at 1982, 26 L.Ed.2d at 429 (noting that for “purposes of the Fourth Amendment there is a constitutional difference between houses and cars”). Thus, the Supreme Court *424 has held that, so long as the probable-cause standard is met, the reduced expectation of privacy in a vehicle and its ready mobility justify an exception to the warrant requirement. Carney, supra, 471 U.S. at 391-93, 105 S.Ct. at 2069-70, 85 L.Ed.2d at 413-14.
The third rationale, and in many ways the most compelling one, is that, for Fourth Amendment purposes, an immediate search of a vehicle may represent a lesser intrusion than impounding the vehicle and detaining its occupants while the police secure a warrant. See Chambers, supra, 399 U.S. at 51-52, 90 S.Ct. at 1981, 26 L.Ed.2d at 428. In Chambers, Justice White, writing for the Court, mused that it was “debatable” whether “the immobilization” of a motor vehicle while the police secured a warrant was a “lesser” or “greater” intrusion than an immediate warrantless search premised on probable cause. Ibid. He concluded that either “seizing and holding a car before presenting the probable cause issue to a magistrate” or “carrying out an immediate search without a warrant” based on probable cause were both “reasonable” courses under the Fourth Amendment. Id. at 52, 90 S.Ct. at 1981, 26 L.Ed.2d at 428.
Across the Supreme Court’s jurisprudential spectrum, Justices have hewed to this viewpoint. Justice Marshall, in a dissent joined by Justice Brennan, wrote that “the warrantless search [of an automobile] is permissible because a warrant requirement would not provide significant protection of the defendant’s Fourth Amendment interests.” United States v. Ross, 456 U.S. 798, 831, 102 S.Ct. 2157, 2176, 72 L.Ed.2d 572, 598 (1982) (Marshall, J., dissenting). Justice Marshall observed that the process of seizing a car and detaining the driver while securing a search warrant “would be more intrusive than the actual search itself.” Ibid. He therefore adhered to the position that “even where police can bring both the defendant and the automobile to the station safely and can house the car while they seek a warrant, the police are permitted to decide whether instead to conduct an immediate search of the car.” Ibid, (emphasis omitted).
*425 We are unaware of any contemporary United States Supreme Court Justice, past or present, who has dissented from the current iteration of the federal automobile exception.[1] No federal case cited by the dissent suggests any wavering over the now well-settled automobile exception.
B.
The overwhelming majority of states have adopted the federal approach to the automobile exception and do not require exigency beyond the inherent mobility of the vehicle.[2] *******10See Commonwealth *426 v. Gary, 625 Pa. 183, 91 A.3d 102, 133-34 (2014) (noting that “most states have adopted the federal automobile exception”). Moreover, a number of states have recently eliminated an exigent-circumstances requirement for automobile searches. See Commonwealth v. Motta, 424 Moss. 117, 676 N.E. 2d 795, 800 (1997); State v. Lloyd, — Nev. -, 312 P.3d 467, 474 (2013); State v. Zwicke, 767 N.W.2d 869, 873 (N.D.2009); Gary, supra, 91 A.3d at 138 (Pa.); State v. Werner, 615 A.2d 1010, 1013-14 (R.I.1992).
The Pennsylvania Supreme Court recently jettisoned its exigent-circumstances standard and adopted the federal automobile exception. Gary, supra, 91 A.3d at 138. Its reasons for doing so were: (1) the “complexity” and “inconsistency” in “decisional law as to what circumstances constitute sufficient danger to the police or the public such that an exigency is present”; (2) the speculative nature of determining whether unknown persons will attempt to tamper with evidence in the vehicle if unguarded; and (3) the Court’s inability to articulate “a consistent, clear, understandable, and readily applicable conception of exigency sufficient to support a warrantless vehicular search.” Id. at 134-37. The Pennsylvania high court ultimately concluded that it was “difficult, if not impossible, for police officers in the field to determine how [it] would rule in motor vehicle search and seizure cases, the circumstances of which are almost endlessly variable.” Id. at 137.
It is noteworthy that those few states that require exigent circumstances are among the least populous or least densely populated states in the country. See State v. Phillips, 67 Haw. 535, 696 P.2d 346, 350 (1985); State v. Elison, 302 Mont. 228, 14 *427 P.3d 456, 471 (2000); State v. Sterndale, 139 N.H. 445, 656 A.2d 409, 411 (1995); State v. Gomez, 122 N.M. 777, 932 P.2d 1, 12 (1997); State v. Anderson, 910 P.2d 1229, 1236 (Utah 1996) (plurality); State v. Bauder, 181 Vt. 392, 924 A.2d 38, 50 (2007); State v. Tibbles, 169 Wash.2d 364, 236 P.3d 885, 888 (2010). Those states do not have the same degree of fast-flowing traffic on crowded highways that pose such a special danger to protracted motor-vehicle stops in New Jersey.
C.
At least as of 1981, this Court did not construe the automobile exception under Article I, Paragraph 7 of our State Constitution differently from the federal interpretation under the Fourth Amendment. In Alston, supra, we upheld the constitutionality of the police search of the defendants’ car based on the United States Supreme Court’s traditional automobile exception to the warrant requirement. 88 N.J. at 235, 440 A.2d 1311.
In Alston, we expressed approval of the federal template for the automobile-exception “recognized in Carroll and Chambers.” Id. at 233, 440 A.2d 1311; see also Paul Stern, Revamping Search- and-Seizure Jurisprudence Along the Garden State Parkway, 41 Rutgers L.J. 657, 669 (2010) (“Historically, the New Jersey Supreme Court aligned its analysis [of the automobile exception] with that of the United States Supreme Court.”). We did not turn to Article I, Paragraph 7 of our State Constitution as a separate source of rights, but instead to Chambers as the controlling law. Alston, supra, 88 N.J. at 231-35, 440 A.2d 1311. We rejected the positions of the defendants and the Appellate Division concerning “the level of ‘exigent circumstances’ ” required for a warrantless automobile search. In doing so, we stated that “[according to Chambers, the exigent circumstances that justify the invocation of the automobile exception are the unforeseeability and spontaneity of the circumstances giving rise to probable cause, and the inherent mobility of the automobile stopped on the highway.” Id. at 233, 440 A.2d 1311 (emphasis added) (internal citations omitted). *428 The “unforeseeability and spontaneity” requirement in Alston came from the United States Supreme Court’s language in Chambers, supra, which observed that “the circumstances that furnish probable cause to search a particular auto for particular articles are most often unforeseeable; moreover, the opportunity to search is fleeting since a car is readily movable.” 399 U.S. at 50-51, 90 S.Ct. at 1981, 26 L.Ed.2d at 428; see Alston, supra, 88 N.J. at 234, 440 A.2d 1311 (crediting Chambers for this Court’s automobile-exception standard).
Significantly, we also made clear in Alston, supra, that merely because “the particular occupants of the vehicle may have been removed from the car, arrested, or otherwise restricted in their freedom of movement,” police were not required to secure a warrant. 88 N.J. at 234, 440 A.2d 1311. Last, relying on Chambers, we emphasized that “when there is probable cause to conduct an immediate search at the scene of the stop, the police are not required to delay the search by seizing and impounding the vehicle pending review of that probable cause determination by a magistrate.” Id. at 234-35, 440 A.2d 1311.
In State v. Martin, 87 N.J. 561, 563-64, 436 A.2d 96 (1981), decided the same day as Alston, we again upheld the search of a car based on “the automobile exception as applied by the Supreme Court in Chambers.” In that case, a police officer discovered an “unoccupied and parked” station wagon that fit the description of the vehicle used in an armed robbery. Id. at 563-65, 436 A.2d 96. The officer peered through the vehicle’s rear windows and observed in plain view evidence related to the crime. Id. at 565, 436 A.2d 96. The officer had the station wagon towed to headquarters, where it was searched without a warrant. Ibid.
Citing to Chambers, we held that “the circumstances that furnished the officers with probable cause were unanticipated and developed spontaneously.” Id. at 570, 436 A.2d 96. We also held that “where police have probable cause to believe that [a] vehicle contains contraband or evidence of criminal activity,” a warrant-less search under the automobile exception is permissible, even if *429 the vehicle is parked and unoccupied. Id. at 567, 436 A.2d 96. We restated the principle in Chambers that “when police have probable cause to conduct a warrantless search of an automobile at the spot where the officers encounter the car, they may constitutionally remove the vehicle to police headquarters and there conduct the search without first obtaining a warrant.” Id. at 568, 436 A.2d 96.
Although not necessary to justify a search pursuant to the automobile exception, the Court listed an independent exigency warranting an immediate search of the vehicle: the suspects in the armed robbery were still at large and “might have returned at any moment to move the ear or remove the ear’s contents.” Id. at 569, 436 A.2d 96. We affirmed that we were keeping faith with the Chambers paradigm. Id. at 570, 436 A.2d 96.
According to one commentator, “Hollowing Alston, the state’s automobile exception, as it pertained to traffic stops, appeared clear: provided that probable cause arose at the time of the seizure, the search of the automobile was warranted.” Stern, supra, 41 Rutgers L.J. at 671.
In State v. Colvin, 123 N.J. 428, 429, 437, 587 A.2d 1278 (1991), we upheld the warrantless search of a drug suspect’s parked car primarily on the basis of a general exigent-circumstances analysis, even though we introduced the issue as one that “concerns the scope of the ‘automobile exception.’” In that case, the police arrested the defendant for his role in a suspected drug transaction. Id. at 430, 587 A.2d 1278. Shortly afterwards, the police were advised by an informant that drugs were stashed in the defendant’s car and that his confederates, who were alerted to his arrest, would attempt to remove drugs from the car. Ibid. On that basis, the police conducted a warrantless search of the parked car and recovered cocaine. Ibid. Colvin evidently did not rely on Alston or Martin, or even Chambers, as the primary precedential guide for resolving the search issue. Rather, Colvin relied on Coolidge v. New Hampshire, 403 U.S. 443, 462, 91 S.Ct. 2022, 2036, 29 L.Ed.2d 564, 580 (1971) (plurality), a case involving the search *430 of a parked car on private property without a valid warrant. Colvin, supra, 123 N.J. at 434-35, 587 A.2d 1278. The search of the ear in Coolidge, supra, was determined to be unconstitutional because the police had known for some time of the car’s role in a murder. 403 U.S. at 460, 91 S.Ct. at 2035, 29 L.Ed.2d at 579. The probable cause in Coolidge did not arise from spontaneous or unforeseeable circumstances.
We found in Colvin, supra, that “nearly all of the factors missing in Coolidge were present” to justify a warrantless search: “Any element of surprise had been lost; the vehicle contained the ‘contraband’ drugs; there were ‘confederates waiting to move the evidence’; the police would need ‘a special police detail to guard the immobilized automobile.’ ” 123 N.J. at 434-35, 587 A.2d 1278 (quoting Coolidge, supra, 403 U.S. at 462, 91 S.Ct. at 2036, 29 L.Ed.2d at 580). Thus, although the Court repeatedly invoked the nomenclature of the automobile exception in Colvin, the constitutional analysis was primarily based on pure exigent circumstances. Colvin was decided strictly on Fourth Amendment grounds. The Court evidently concluded that its decision was harmonious with federal jurisprudence because Colvin does not once mention our State Constitution as a separate source of rights.
D.
In Cooke, supra, this Court broke ranks with the United States Supreme Court’s Fourth Amendment automobile-exception jurisprudence, which held in Labron — and later again in Dyson — that “ ‘if a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment ... permits police to search the vehicle without more.’ ” 163 N.J. at 665, 671, 751 A.2d 92 (quoting Labron, supra, 518 U.S. at 940, 116 S.Ct. at 2487, 135 L.Ed.2d at 1036); see Dyson, supra, 527 U.S. at 467, 119 S.Ct. at 2014, 144 L.Ed.2d at 445. Notably, the United States Supreme Court in Labron rejected the Pennsylvania Supreme Court’s automobile-exception rule, which permitted warrantless searches when “ ‘unforeseen circumstances involving the search of an auto *431 mobile are coupled with the presence of probable cause.’ ” Cooke, supra, 163 N.J. at 666, 751 A.2d 92 (quoting Labron, supra, 518 U.S. at 940, 116 S.Ct. at 2487, 135 L.Ed.2d at 1035).
Our Court announced for the first time in Cooke that, under Article I, Paragraph 7 of our State Constitution, the warrantless search of a vehicle could only be justified based on exigent circumstances in addition to probable cause. Id. at 671, 751 A.2d 92.
The federal automobile-exception jurisprudence, until Labron, was far from a model of clarity. Indeed, Labron did not even cite to Chambers as authority, the very case from which we crafted in Alston the requirement that probable cause must arise from unforeseeable and spontaneous circumstances.
In Cooke, however, the Court parted ways not only with the federal automobile-exception standard, but also with its own automobile exception articulated in Alston. Cooke imposed a full-blown exigency analysis, holding that “exigency in the constitutional context amounts to ‘circumstances that make it impracticable to obtain a warrant when the police have probable cause to search the car.’ ” Id. at 676, 751 A.2d 92 (quoting Colvin, supra, 123 N.J. at 437, 587 A.2d 1278). That approach eliminated any vestige of the automobile exception, even the one we defined in Alston. That exacting exigent-circumstances standard, if faithfully applied, should result in the securing of search warrants in most automobile-search cases — and probably should have resulted in one even in Cooke.
The exigency requirement in Alston, as the Cooke Court noted, was the “‘unforeseeability and spontaneity of the circumstances giving rise to probable cause, and the inherent mobility of the automobile,’ ” id. at 672, 751 A.2d 92 (quoting Alston, supra, 88 N.J. at 233, 440 A.2d 1311), and “the unanticipated circumstances that give rise to probable cause occur swiftly,” ibid, (citing Alston, supra, 88 N.J. at 234, 440 A.2d 1311). The language in Alston ensured that police officers who possessed probable cause well in advance of an automobile search sought a warrant. Police officers *432 could not sit on probable cause and later conduct a warrantless search, for then the inherent mobility of the vehicle would have no connection with a police officer not procuring a warrant. The Alston standard provided a limited exigency to the warrant requirement.
However, just because the circumstances giving rise to probable cause are unforeseeable and spontaneous does not mean that it is impracticable to secure a warrant. For example, a car may be stopped for speeding, and the officer may smell an overpowering odor of marijuana and then arrest, handcuff, and place the driver in the back of a patrol car. Although the probable cause to search arose in an unforeseeable and spontaneous fashion, the officer under the Cooke exigent-circumstances standard should still obtain a search warrant because there is no danger of evidence tampering if the car is impounded and the occupants secured.
Accordingly, searches that had been permissible under Alston were no longer lawful under Cooke. But the question is whether Cooke gave rise to a practicable and workable standard capable of producing fairly uniform results. We now turn to the facts of Cooke, to which the Court applied its new exigent-circumstances standard.
In Cooke, supra, a police officer conducting surveillance observed the defendant participate in drug transactions and, on one occasion, place suspected drugs in a Ford Escort. 163 N.J. at 662, 751 A.2d 92. The defendant and an accomplice drove off in another car, but were stopped by police officers serving as a perimeter team. Ibid. The officers arrested the defendant on an unrelated warrant and detained the accomplice. Id. at 662-63, 751 A.2d 92. The officers took from the defendant his keys to the Escort and conducted an on-scene search of the car, which uncovered illicit drugs. Id. at 663, 751 A.2d 92.
The trial court and Appellate Division both concluded that a search of the Escort was not justified by exigent circumstances. Ibid. This Court, however, reversed on the ground that it would have been impracticable to require the police to obtain a warrant *433 and therefore an immediate search was permissible. Id. at 675, 751 A.2d 92. However, the Escort was under continuing surveillance by one officer, and other officers could have impounded the car and secured a search warrant. Id. at 662-63, 751 A.2d 92. Viewed in that light, the exigency concerns identified by the Court — e.g., third parties may have been alerted and removed drugs from the car or the car itself, id. at 675, 751 A.2d 92 — were not real given that the car could easily have been placed under police control.
The finding of exigency in Cooke was questionable. When the driver of a car is arrested, secured by handcuffs, or placed in a patrol vehicle, and the car can be impounded, the procuring of a search warrant would seem practicable in most cases. In contrast, a warrantless search would have been permissible under the Alston standard because the probable cause arose from unforeseeable and spontaneous circumstances.
E.
In Pena-Flores, supra, 198 N.J. at 11, 28, 965 A.2d 114, the Court reaffirmed the exigent-circumstances standard enunciated in Cooke, rejecting the State’s plea for a return to the Alston paradigm. The Court declared that “the warrantless search of an automobile in New Jersey is permissible where (1) the stop is unexpected; (2) the police have probable cause to believe that the vehicle contains contraband or evidence of a crime; and (3) exigent circumstances exist under which it is impracticable to obtain a warrant.” Id. at 28, 965 A.2d 114. The Court emphasized that “exigency encompasses far broader considerations than the mere mobility of the vehicle” and that “[ejxigency must be determined on a case-by-case basis” with an evaluation of the totality of circumstances focused on “officer safety and the preservation of evidence.” Id. at 28-29, 965 A.2d 114. The Court stated that in assessing exigency, “[Ijegitimate considerations are as varied as the possible scenarios surrounding an automobile stop.” Id. at 29, 965 A.2d 114. The Court then gave examples of the *434 considerations that police officers might take into account in determining exigency:
the time of day; the location of the stop; the nature of the neighborhood; the unfolding of the events establishing probable cause; the ratio of officers to suspects; the existence of confederates who know the location of the car and could remove it or its contents; whether the arrest was observed by passersby who could tamper with the car or its contents; whether it would be safe to leave the car unguarded and, if not, whether the delay that would be caused by obtaining a warrant would place the officers or the evidence at risk.

[Ibid.]

The Court acknowledged “that exigency assessments are difficult for the officer on the street,” but considered “the importance of the rights involved” as a reason for not returning “to a pure Alston analysis.” Id. at 33, 965 A.2d 114. The Court encouraged the use of telephonic and electronic warrants as a means to meet the constitutional challenges of motor-vehicle stops. Id. at 33-36, 965 A.2d 114. The Court maintained that the police should be given “access to an efficient and speedy electronic and telephonic warrant procedure that will be available to them on the scene; that will obviate the need for difficult exigency assessments; and that will guarantee our citizens the protections that the warrant requirement affords.” Id. at 36, 965 A.2d 114.
To advance that goal, the Court established a Task Force “to address the practical issues involved in obtaining telephonic and electronic warrants” and “make practical suggestions to ensure that technology becomes a vibrant part of our process.” Id. at 35, 965 A.2d 114.
Y.
A.
In the wake of Pena-Flores, this Court created the Supreme Court Special Committee on Telephonic and Electronic Search Warrants, which issued its report in January 2010. Report of the Supreme Court Special Committee on Telephonic and Electronic Search Warrants (2010). In its Report, the Special Committee *435 made a number of observations and recommendations, some of which are relevant to our analysis.
The Special Committee noted that no jurisdiction in the nation “had established statewide procedures for obtaining telephonic search warrants.” Id. at 9. The Special Committee specifically addressed the San Diego Search Warrant Project, which was cited in Pena-Flores “in support of the more widespread use of telephonic applications for search warrants.” Ibid. The Special Committee commented that “a closer look at the [San Diego project] revealed that only 14 of 122 search warrants were telephonic warrants, and not a single warrant, telephonic or otherwise, was issued solely for the search of an automobile.” Ibid, (citing Laurence A. Benner & Charles T. Samarkos, Searching for Narcotics in San Diego: Preliminary Findings from the San Diego Search Warrant Project, 36 Cal. W.L.Rev. 221 (2000)). The Committee reasoned that “the San Diego study did not offer much guidance” for New Jersey roadside stops because “California follows the federal standard regarding warrantless automobile searches.” Id. at 10.
The Special Committee expressed concerns about the dangers to police officers and a car’s driver and occupants resulting from extended stops “on the sides of heavily-traveled highways and roads” as an officer “engagefs] in seeking a telephonic warrant.” Id. at 17. The Committee also recognized that the warrant process might implicate “resource issues” for smaller departments. Ibid. The Committee concluded that “safety and police resource concerns dictated” that search-warrant applications “be completed in no more than 45 minutes, with an ideal goal of 30 minutes.” Ibid.
The Committee outlined the steps to be taken in securing a telephonic search warrant when a police officer “believes [that] there is probable cause to search”: (1) the officer must first “contact[] the county’s on-duty prosecutor”; (2) the officer and on-duty prosecutor must then “have a discussion regarding whether or not to request a search warrant”; (3) if the prosecutor *436 “believes a search warrant is necessary, the prosecutor, with the police officer still on the connection, contacts the on-duty judge”; (4) the judge must administer an oath to the officer; (5) the officer must “identify himself, state the purpose of the request and present facts supporting the applications”; and (6) the officer must give sworn oral testimony. Id. at 19.
Given those multiple steps, the question remained whether the Committee’s 30- to 45-minute timeframe for securing telephonic search warrants was feasible.
B.
Following the Special Committee’s Report, the Administrative Office of the Courts conducted two pilot programs, one in Mercer County and another in Burlington County. See Burlington Vicinage, Telephonic Search Warrants (Pena-Flores) Pilot Program. The Mercer County pilot program lasted only two months, yielding “very few telephonic search warrant applications” and “very little useable data.” Id. at 3-4. That prompted the Burlington County pilot program, which ran from September 2011 to March 2012. Id. at 4, 6.
During that period, the State Police and local law-enforcement agencies filed 42 telephonic automobile search-warrant applications in Burlington County. Id. at 6. “The average request for an automobile warrant took approximately 59 minutes,” from the inception of the call to its completion. Ibid.
Separately, the State Police reported to the Administrative Office of the Courts that, during the Burlington County pilot program’s six-month timeframe, Troop C applied for 16 telephonic search warrants, with the process taking, on average, 1.5 to 2 hours. Id. at 10. The State Police also noted that, since Pena-Flores, its “state-wide consent to search requests r[o]se from approximately 300 per year to over 2500 per year.” Ibid, (emphasis omitted). The State Police explained that its “current patrol policy and practice is to exhaust the consent search option prior to making a determination to seek a warrant, telephonic or in- *437 person.” Ibid. In the Burlington County project, the State Police obtained the driver’s or occupants’ consent to search in 95% of the motor-vehicle stops. Id. at 7.
C.
In State v. Shannon, 210 N.J. 225, 227, 43 A.3d 1146 (2012), we declined the State’s request to revisit Pena-Flores, finding that the motor-vehicle data submitted by the State was insufficient “to establish the ‘special justification’ needed to depart from precedent.” [3] In the event of a future challenge to Pena-Flores, we invited the parties, including the Attorney General, “to amass and develop a more thorough, statistical record over time relating to motor vehicle stops by the State Police and local authorities.” Ibid. We indicated that such “information should include, where possible, (a) the total number of motor vehicle stops, (b) the number of warrantless probable cause searches conducted, consent searches requested, consent searches conducted, and vehicles impounded — both before and after Pena-Flores — and (c) other relevant information.” Id. at 227-28, 43 A.3d 1146.
Following Shannon, the Office of Law Enforcement Professional Standards published a report entitled “The Effects of Pena-Flores on Municipal Police Departments.” Second Report: The Effects of Penar-Flores on Municipal Police Departments (2013).[4] The Report analyzed statistical data submitted by 103 participating municipal police departments and the State Police regarding automobile searches before and after the decision in Pena-Flores. The one firm conclusion reached by the Office of Professional Standards was that “after the Pena-Flares decision, there was a noticeable increase in consent to search requests for both municipal departments and the State Police; even with only a slight *438 increase in the number of motor vehicle stops.” Id. at 38. Indeed, since Pena-Flores, State Police consent searches surged ten-fold and municipal law enforcement consent searches increased by two hundred percent. Id. at 14.[5] In addition, the statistics reveal that more than 95% of operators or occupants consented to the search of their vehicles. Id. at 14, 19. Overall, in the period after Pena-Flores, the number of municipal automobile searches nearly doubled due to the increased number of consent searches. By contrast, search warrant requests from municipal departments did not increase to a statistically significant level, and those from the State Police have climbed but account for only a fraction of the total number of searches. See id. at 27, 38.[6] At least among municipal departments, the number of non-con *439 sent, warrantless searches have remained fairly constant before and after Penar-Flores. Id. at 32.[7]
VI.
The issue before the Court is whether to continue down the path laid by Cooke and reinforced by Penar-Flores, recognizing that Cooke departed from our decision in Alston. The resolution of the issue implicates the doctrine of stare decisis.
Stare decisis promotes consistency, stability, and predictability in the development of legal principles and respect for judicial decisions. See Shannon, supra, 210 N.J. at 226, 43 A.3d 1146. For that reason, a “special justification” is required to depart from precedent. State v. Brown, 190 N.J. 144, 157-58, 919 A.2d 107 (2007) (quoting Dickerson v. United States, 530 U.S. 428, 443, 120 S.Ct. 2326, 2336, 147 L.Ed.2d 405, 419 (2000)).
Although stare decisis furthers important policy goals, it is not an inflexible principle depriving courts of the ability to correct their errors. Fox v. Snow, 6 N.J. 12, 23, 76 A.2d 877 (1950) (Vanderbilt, C.J., dissenting) (“The doctrine of stare decisis [does not] render[] the courts impotent to correct their past errors----”); see also White v. Twp. of N. Bergen, 77 N.J. 538, 550-52, 391 A.2d 911 (1978) (noting acceptance of “Vanderbilt thesis”). Experience and further consideration will reveal, at times, that a well-intentioned decision is not furthering the goal it *440 was intended to advance. Therefore, “the nature of the judicial process requires the power to revise, to limit, and to overrule if justice is to be done.” Shannon, supra, 210 N.J. at 227, 43 A.3d 1146. Stare decisis is not a command to perpetuate the mistakes of the past. See Lawrence v. Texas, 539 U.S. 558, 577, 123 S.Ct. 2472, 2483, 156 L.Ed.2d 508, 525 (2003). “Among the relevant considerations in determining whether to depart from precedent are whether the prior decision is unsound in principle [and] unworkable in practice____” Shannon, supra, 210 N.J. at 227, 43 A.3d 1146.
The United States Supreme Court has not considered stare decisis to be an “inexorable command” to continue down a mistaken jurisprudential path and, accordingly, has reversed itself on a number of occasions. See Lawrence, supra, 539 U.S. at 577-78, 123 S.Ct. at 2483-84, 156 L.Ed.2d at 525-26 (overturning Bowers v. Hardwick, 478 U.S. 186, 196, 106 S.Ct. 2841, 2846-47, 92 L.Ed.2d 140, 149 (1986), and striking down statute that made it crime for two persons of same sex “to engage in certain intimate sexual conduct”); see, e.g., Arizona v. Gant, 556 U.S. 332, 351, 129 S.Ct. 1710, 1723-24, 173 L.Ed.2d 485, 501 (2009) (overturning New York v. Belton, 453 U.S. 454, 460, 101 S.Ct. 2860, 2864, 69 L.Ed.2d 768, 775 (1981), and redefining when police may search car’s passenger compartment incident to arrest); Gideon v. Wainwright, 372 U.S. 335, 342-45, 83 S.Ct. 792, 795-97, 9 L.Ed.2& 799, 804-06 (1963) (overruling Betts v. Brady, 316 U.S. 455, 471, 62 S.Ct. 1252, 1261, 86 L.Ed. 1595, 1606 (1942), and providing counsel to indigent defendants in state prosecutions); Brown v. Bd. of Educ. of Topeka, 347 U.S. 483, 495, 74 S.Ct. 686, 692, 98 L.Ed. 873, 881 (1954) (overruling Plessy v. Ferguson, 163 U.S. 537, 548, 16 S.Ct. 1138, 1142, 41 L.Ed. 256, 260 (1896), and striking down “separate but equal” doctrine).
The High Court also has not permitted an incorrect decision to linger merely because it was of recent origin. See, e.g., W. Va. State Bd. of Educ. v. Barnette, 319 U.S. 624, 642, 63 S.Ct. 1178, 1187, 87 L.Ed. 1628, 1639-40 (1943) (overturning Minersville Sch. *441 Dist. v. Gobitis, 310 U.S. 586, 600, 60 S.Ct. 1010, 1015-16, 84 L.Ed. 1375, 1382 (1940), and holding that schoolchildren cannot be compelled to salute flag or recite Pledge of Allegiance); Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 227, 115 S.Ct. 2097, 2113, 132 L.Ed.2d 158, 182 (1995) (overturning Metro Broad., Inc. v. Fed. Commc’ns Comm’n, 497 U.S. 547, 596-97, 110 S.Ct. 2997, 3026, 111 L.Ed.2d 445, 483 (1990), and holding that all racial classifications made by government actors must undergo strict scrutiny analysis).
In light of those principles, we now discuss whether Pena-Flores is furthering the constitutional values that are protected by Article I, Paragraph 7 of the New Jersey Constitution and whether there is “special justification” for departing from it.
VII.
A.
Clearly, the use of telephonic search warrants has not resolved the difficult problems arising from roadside searches, as the Court expected when it decided Pena-Flores. The Supreme Court Special Committee on Telephonic and Electronic Search Warrants was greatly concerned about the safety of police officers and a car’s driver and occupants detained on the side of a heavily traveled highway or road while a telephonic warrant is secured. The Committee set a time limit for the completion of such search-warrant applications: “no more than 45 minutes, with an ideal goal of 30 minutes.” Supreme Court Telephonic Warrants Report, supra, at 17. Nevertheless, nearly three years after Pena-Flores, the Burlington County project commissioned by the Administrative Office of the Courts found that the average time for obtaining a telephonic warrant was 59 minutes, and the State Police reported that Troop C experienced times of between 1.5 and 2 hours in the warrant-application process. Pena-Flores Pilot Program, supra, at 6,10. The hope that technology would reduce the perils of roadside stops has not been realized. Prolonged encounters on *442 the shoulder of a crowded highway — even within the range of 30 to 45 minutes — may pose an unacceptable risk of serious bodily injury and death. News reports reveal the carnage caused by cars and trucks crashing into police officers and motorists positioned on the shoulders of our highways.[8]
The dramatic increase in the number of consent searches since Pena-Flores is apparently an unintended consequence of that decision. With hindsight, the explanation becomes clearer. Consent searches avoid the dangers of protracted roadway stops while search warrants are procured, and they remove the legal unpredictability surrounding a warrantless search based on the complex of factors detailed in Pena-Flores. We are not as sanguine as defendant and amici about the benefits of consent searches in such great numbers.
Not long ago, the State Police subjected minority motorists to consent searches on a grossly disproportionate basis because of racial profiling. Attorney General, Interim Report of the State Police Review Team Regarding Allegations of Racial Profiling, at 27, 30 (1999), available at http://www.state.nj .us/lps/intm_419.pdf. As a result of the abuse of consent searches, the State Police were placed under the supervision of federal monitors pursuant to a consent decree. See State v. Herrerra, 211 N.J. 308, 325, 48 A.3d *443 1009 (2012) (discussing consent decree). “After two independent monitors reported substantial and uninterrupted compliance for the forty-five months from early 2004 through December 2007, and after a series of public hearings conducted by the Advisory Committee on Police Standards, a federal judge granted the parties’ joint application for termination of the consent decree.” Ibid.
Statistical data accumulated from the federal monitors’ reports indicated that “nearly ninety-five percent of detained motorists granted a law enforcement officer’s request for consent to search.” State v. Carty, 170 N.J. 632, 644-45, 790 A.2d 903 (2002) (citing Monitors’ Second Report: Long-term Compliance Audit, at 8 (Jan. 2001); Monitors’ Third Report: Long-term Compliance Audit, at 8 (Apr. 2001); Monitors’ Fourth Report: Long-term Compliance Audit, at 8 (July 2001)). The federal reports’ finding that 95% of motorists accede to requests for consent to search is confirmed by more recent reports. See Pena-Flores Pilot Program, supra, at 7; Pena-Flores Report, supra, at 14, 19.
Given the widespread abuse of consent searches, this Court in Carty forbade police officers from making consent-search requests unless they had reasonable and articulable suspicion to believe a vehicle contained contraband or evidence of an offense. Id. at 647, 790 A.2d 903. Still, that standard does not remove the coercive effect of a search request made to a motorist stopped on the side of a road. We recognized in Carty “the inherently coercive predicament of the driver who is stopped on the highway and faced with the perceived choice of either refusing consent to search and therefore increasing the likelihood of receiving a traffic summons, or giving consent to search in the hope of escaping with only a warning.” State v. Domicz, 188 N.J. 285, 306, 907 A.2d 395 (2006). Under those and other like circumstances, “it is not a stretch of the imagination to assume that the individual feels compelled to consent.” Carty, supra, 170 N.J. at 644, 790 A.2d 903.
*444 To be sure, consent searches are permissible if not abused. Nevertheless, when it decided Pena-Flores, the Court did not expect that the rejection of the automobile exception would lead to police dependency on consent searches. We also must be mindful that consent searches may be made on less than probable cause and that after Penar-Flores the number of searches conducted by municipal police officers nearly doubled due to the increased number of consent searches.
We are not willing to conclude that the increase in consent searches after Pena-Flores is serendipitous.
B.
Law enforcement’s new-found reliance on consent searches, in part, is an apparent reflection of the difficulty presented to police officers by the Pena-Flores multi-factor exigent-circumstances standard. Under that standard, before conducting a warrantless roadside search, police officers must take into account a dizzying number of factors. Pena-Flores, supra, 198 N.J. at 29, 965 A.2d 114. These factors leave open such questions as “what is the acceptable ratio of officers to suspects, what should the officer know about the neighborhood, how is he to know if confederates are skulking about, and what does it mean to consider leaving the ear unguarded when the car can be safely towed and impounded?” Id. at 47, 965 A.2d 114 (Albin, J., dissenting). The statistics suggest that the Pena-Flores exigency formula has left “many police officers with an unwillingness to hazard a guess, fearing that a mistaken decision will result in the suppression of critical evidence.” See ibid. For a law enforcement officer responding to rapidly evolving events on the side of a road, the exigency formula requires the processing of such confounding and speculative information that we cannot expect uniform and consistent decision-making. Thus, searches based on the Pena-Flores factors must inevitably “lead to widely divergent outcomes and allow trial courts and appellate courts routinely to second-guess the officers on the scene and eventually themselves.” Ibid.
*445 This is the very conclusion reached by the Pennsylvania Supreme Court, which recently abandoned its own multi-factor exigency analysis for warrantless searches of automobiles. In Gary, supra, the Pennsylvania high court expressed that its exigency requirement “is a difficult standard to apply, not just for the court, but also, and more importantly, for police officers operating in the field, often in the midst of a fast-moving investigation.” 91A 3d at 135. The court also detailed the inconsistent judicial outcomes emanating from its exigency standard. Id. at 135-36. In adopting the federal automobile exception, the Gary Court acknowledged the futility of its own standard because exigency “can turn on small facts in the midst of a complex, volatile, fast-moving, stressful, and potentially threatening situation in the field.” Id. at 134.
The dissent in Pena-Flores, supra, wrongly predicted that our exigency standard would lead prudent police officers to impound cars and detain their occupants while securing a warrant, 198 N.J. at 47, 965 A.2d 114 (Albin, J., dissenting); instead, those risk-averse police officers have responded with an explosion of consent searches.
C.
In Pena-Flores, the Court stated that, in determining exigency, the fundamental inquiry is “[h]ow the facts of the case bear on the issues of officer safety and the preservation of evidence.” Id. at 28-29, 965 A.2d 114 (majority). However, as the State submits, typically, “police officers will not search a vehicle at roadside until the situation is under control,” that is, “a vehicle will not be searched until that search can be done safely.” If an automobile’s occupants are secured or detained so that they cannot destroy evidence or gain access to a weapon, the exigency to search the vehicle is illusory and, by all rights, a warrant should be secured. Accepting this reality means that, for the most part, warrantless roadside searches will not occur — unless done by consent. That *446 logic is dictated by our decision in State v. Eckel, 185 N.J. 523, 524, 888 A.2d 1266 (2006).
In Eckel, we held that the warrantless search of an automobile is impermissible under the search-ineident-to-arrest exception once a vehicle’s driver or occupant has been arrested, removed, and secured. Id. at 541, 888 A.2d 1266. We identified the two justifications for the search-incident-to-arrest exception — “the protection of the police and the preservation of evidence,” id. at 524, 888 A.2d 1266, the very same factors identified as bearing on exigency to conduct a probable-cause warrantless search of a car, Pena-Flores, supra, 198 N.J. at 28-29, 965 A.2d 114. In Eckel, supra, we determined that police safety and evidence preservation are not a basis for a vehicle search incident to an arrest when a person “effectively is incapacitated.” 185 N.J. at 524, 888 A.2d 1266. The same must be true in the case of a warrantless search of a car predicated on probable cause.
Accordingly, the routine police-citizen roadside encounter is unlikely to involve a genuine exigency that will lead to a warrant-less search absent consent.
D.
The current approach to roadside searches premised on probable cause — “get a warrant” — places significant burdens on law enforcement. On the other side of the ledger, we do not perceive any real benefit to our citizenry by the warrant requirement in such cases — no discernible advancement of their liberty or privacy interests. When a police officer has probable cause to search a ear, is a motorist better off being detained on the side of the road for an hour (with all the accompanying dangers) or having his car towed and impounded at headquarters while the police secure a warrant? Is not the seizure of the car and the motorist’s detention “more intrusive than the actual search itself’? See Ross, supra, 456 U.S. at 831, 102 S.Ct. at 2176, 72 L.Ed.2d at 598 (Marshall, J., dissenting). At the very least, which is the greater or lesser intrusion is debatable, as Justice White observed in *447 Chambers, supra, 399 U.S. at 51-52, 90 S.Ct. at 1981, 26 L.Ed.2d at 428. For that reason, the United States Supreme Court has concluded that “carrying out an immediate search without a warrant” based on probable cause is “reasonable” under the Fourth Amendment. Id. at 52, 90 S.Ct. at 1981, 26 L.Ed.2d at 428. We reach the same conclusion under Article I, Paragraph 7 of the New Jersey Constitution, subject to the caveats in Alston.
Although we believe that the exigent-circumstances standard set forth in Cooke and Penar-Flores is unsound in principle and unworkable in practice, we do not adopt the federal standard for automobile searches because that standard is not fully consonant with the interests embodied in Article I, Paragraph 7 of our State Constitution.
VIII.
In Alston, supra, we held that the automobile exception authorized the warrantless search of an automobile only when the police have probable cause to believe that the vehicle contains contraband or evidence of an offense and the circumstances giving rise to probable cause are unforeseeable and spontaneous. 88 N.J. at 233, 440 A.2d 1311. In articulating that standard, we believed we were merely following the test set forth by the United States Supreme Court in Chambers. Labron and Dyson make clear that even an unforeseeability and spontaneity requirement is not part of the federal automobile exception.
Here, we part from the United States Supreme Court’s interpretation of the automobile exception under the Fourth Amendment and return to the Alston standard, this time supported by Article I, Paragraph 7 of our State Constitution. Alston properly balances the individual’s privacy and liberty interests and law enforcement’s investigatory demands. Alston’s requirement of “unforeseeability and spontaneity,” id. at 233, 440 A.2d 1311, does not place an undue burden on law enforcement. For example, if a police officer has probable- cause to search a ear and is looking for that ear, then it is reasonable to expect the officer to secure a *448 warrant if it is practicable to do so. In this way, we eliminate the concern expressed in Cooke, supra — the fear that “a car parked in the home driveway of vacationing owners would be a fair target of a warrantless search if the police had probable cause to believe the vehicle contained drugs.” 163 N.J. at 667-68, 751 A.2d 92. In the case of the parked car, if the circumstances giving rise to probable cause were foreseeable and not spontaneous, the warrant requirement applies.
We adopt this approach under our State Constitution because it is a reasonable accommodation of the competing interests between the individual’s right to be free from unreasonable searches and law enforcement’s investigatory demands. “[W]e have not hesitated to find that our State Constitution provides our citizens with greater rights ... than those available under the United States Constitution.” Lewis v. Harris, 188 N.J. 415, 456, 908 A.2d 196 (2006). On many occasions, “this Court has found that the State Constitution provides greater protection against unreasonable searches and seizures than the Fourth Amendment.” State v. Earls, 214 N.J. 564, 584, 70 A.3d 630 (2013) (citing State v. Reid, 194 N.J. 386, 389, 945 A.2d 26 (2008) (recognizing reasonable expectation of privacy in Internet subscriber information); State v. McAllister, 184 N.J. 17, 19, 875 A.2d 866 (2005) (finding reasonable expectation of privacy in bank records); State v. Mollica, 114 N.J. 329, 344-45, 554 A.2d 1315 (1989) (finding privacy interest in hotel-room telephone toll billing records); State v. Novembrino, 105 N.J. 95, 159, 519 A.2d 820 (1987) (declining to find good-faith exception to exclusionary rule); State v. Hunt, 91 N.J. 338, 345, 450 A.2d 952 (1982) (finding privacy interest in telephone toll billing records)). We make that same finding here in hewing once again to the Alston standard.
We also part from federal jurisprudence that allows a police officer to conduct a warrantless search at headquarters merely because he could have done so on the side of the road. See Chambers, supra, 399 U.S. at 52, 90 S.Ct. at 1981-82, 26 L.Ed.2d at 428-29. “Whatever inherent exigency justifies a warrantless *449 search at the scene under the automobile exception certainly cannot justify the failure to secure a warrant after towing and impounding the car” at headquarters when it is practicable to do so. Pena-Flores, supra, 198 N.J. at 39 n. 1, 965 A.2d 114 (Albin, J., dissenting). Warrantless searches should not be based on fake exigencies. Therefore, under Article I, Paragraph 7 of the New Jersey Constitution, we limit the automobile exception to on-scene warrantless searches.[9]
IX.
Today’s decision is a new rule of law that we apply purely prospectively because to do otherwise would be unfair and potentially offend constitutional principles that bar the imposition of an “ex post facto law.” U.S. Const, art. I, § 10; N.J. Const, art. IV, § 7,113.
The United States Constitution and the New Jersey Constitution both prohibit the State Legislature from passing an “ex post facto law.” U.S. Const, art. I, § 10; N.J. Const, art. IV, § 7, ¶ 3. The Ex Post Facto Clause applies equally to laws that emanate from judicial decisions. Bouie v. Columbia, 378 U.S. 347, 353-54, 84 S.Ct. 1697, 1702, 12 L.Ed.2d 894, 900 (1964) (“If a state legislature is barred by the Ex Post Facto Clause from passing such a law, it must follow that a State Supreme Court is barred by the Due Process Clause from achieving precisely the same result by judicial construction.”).
The Ex Post Facto Clause proscribes “[e]very law that alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of the commission of the offence, in order to convict the offender. All these, and similar laws, are manifestly unjust and oppressive.” Calder v. *450 Bull, 3 U.S. (3 Dall.) 386, 390-91, 1 L.Ed. 648, 650 (1798). “Every law that takes away, or impairs, rights vested, agreeably to existing laws, is retrospective, and is generally unjust, and may be oppressive____” Id. at 391, 1 L.Ed. at 650.
Under Pena-Flores, the applicable law at the time of the motor-vehicle stop in this case, the police officer who arrested defendant on suspicion of driving while intoxicated did not have exigent circumstances to search the car for opened bottles of alcohol, according to the factual findings of the trial court, which were affirmed by the Appellate Division. We must defer to those findings because they are supported by sufficient credible evidence in the record. See State v. Elders, 192 N.J. 224, 243-44, 927 A.2d 1250 (2007). We acknowledge that a different outcome might be reached under the Alston standard. However, because Alston is a new rule of law applied prospectively we need not address that issue.
X.
For the reasons expressed, the exigent-circumstances test in Cooke and Pena-Flores no longer applies. We return to the standard set forth in Alston for warrantless searches of automobiles based on probable cause. Going forward, searches on the roadway based on probable cause arising from unforeseeable and spontaneous circumstances are permissible. However, when vehicles are towed and impounded, absent some exigency, a warrant must be secured.
This decision is a new rule of law and will be given prospective application from the date of this opinion. For purposes of this appeal, Pena-Flores is the governing law. Accordingly, we affirm the judgment of the Appellate Division, which upheld the suppression of evidence in this case. Though it does not change the outcome, we add that the Appellate Division erred in addressing the validity of the motor-vehicle stop because that issue was not raised before the trial court.
*451 We remand for proceedings consistent with this opinion.

 In Dyson, supra, although dissenting from the majority's summary reversal of the Maryland Court of Appeals, Justices Breyer and Stevens nonetheless "agree[d] that the Court’s per curiam opinion correctly states the law" on the automobile exception. 527 U.S. at 468, 119 S.Ct. at 2014, 144 L.Ed.2d at 446 (Breyer, J., dissenting). In Labron, supra, Justices Stevens and Ginsburg dissented solely on procedural grounds in that automobile search case. 518 U.S. at 941-42, 116 S.Ct. at 2487-88, 135 L.Ed.2d at 1036-37 (Stevens, J., dissenting). They believed that the Pennsylvania Supreme Court had rested its decision on its own Constitution, and for that reason the United States Supreme Court should not have exercised its jurisdiction. Ibid. They did not disagree with the majority's description of the federal automobile exception. Ibid.

 See Mewbourn v. State, 570 So.2d 805, 810 (Ala.Crim.App.1990); State v. Prasertphong, 75 P.3d 675, 685 (Ariz.2003); State v. Crane, 446 S.W.3d 182, 186 (Ark.2014); People v. Chavers, 658 P.2d 96, 101 (Cal.1983); People v. Hill, 929 P.2d 735, 739 (Colo.1996); State v. Winfrey, 24 A.3d 1218, 1224 (Conn.2011); Reeder v. State, 783 A.2d 124 (Del.2001); State v. Starkey, 559 So.2d 335, 339 (Fla.Dist.Ct.App.1990); State v. Lejeune, 576 S.E.2d 888, 892 (Ga.2003); State v. Tucker, 979 P.2d 1199, 1200 (Idaho 1999); People v. Contreras, 387 Ill.Dec. 323, 22 N.E.3d 368, 377 (Ill.App.Ct.2014); Meister v. State, 933 N.E.2d 875, 880 (Ind.2010); State v. Cain, 400 N.W.2d 582, 585 (Iowa 1987); State v. Conn, 99 P.3d 1108, 1114 (Kan.2004); Chavies v. Commonwealth, 354 .S.W.3d 103, 111 (Ky.2011); State v. Thompson, 842 So.2d 330, 336-38 (La.2003); State v. Melvin, 955 A.2d 245, 250 (Me.2008); Fairv. State, 16 A.3d 211, 217 (Md.Ct.Spec.App. 2011); Commonwealth v. Motta, 676 N.E.2d 795, 799 (Mass.1997); People v. Kazmierczak, 605 N.W.2d 667, 672 (Mich.2000); State v. Gauster, 752 N.W.2d 496, 508 (Minn.2008); Franklin v. State, 587 So.2d 905, 907 (Miss.1991); State v. Burkhardt, 795 S.W.2d 399, 404 (Mo.1990); State v. Neely, 462 N.W.2d 105, 109-10 (Neb.1990); State v. Lloyd,-Nev.-, 312 P.3d 467, 474 (2013); People v. Galak, 616 N.E.2d 842, 844 (N.Y.1993); State v. Isleib, 356 S.E.2d 573, 576-77 (N.C.1987); State v. Zwicke, 767 N.W.2d 869, 873 (N.D.2009); State v. Welch, *426 480 N.E.2d 384, 387-88 (Ohio), cert, denied, 474 U.S. 1010, 106 S.Ct. 537, 88 L.Ed.2d 468 (1985); Gomez v. State, 168 P.3d 1139, 1145 (Okla.Crim.App.2007); State v. Meharry, 149 P.3d 1155, 1157 (Or.2006); Commonwealth v. Gary, 91 A.3d 102, 138 (Pa.2014); State v. Werner, 615 A.2d 1010, 1014 (R.I.1992); State v. Weaver, 649 S.E.2d 479, 482 (S.C.2007); State v. Sweedland, 721 N.W.2d 409, 412-13 (S.D.2006); State v. Saine, 297 S.W.3d 199, 207 (Tenn.2009); State v. Guzman, 959 S.W.2d 631, 634 (Tex.Crim.App.1998); Duncan v. Commonwealth, *427 684 S.E.2d 838, 840 (Va.Ct.App.2009); State v. Tompkins, 144 Wis.2d 116, 423 N.W.2d 823, 829 (1988); Phippen v. State, 297 P.3d 104, 108 (Wyo.2013).

 The Burlington County Study was not before the Court at the time Shannon was decided.

 The second report incorporates all statistical information contained in the first report.

 Automobile Consent Searches Conducted by State Police
Pre-Pena-Flores Post-Pena-Flores
[[Image here]]
Automobile Consent Searches Conducted by Municipal Departments
Pre-Pena-Flores_Pos t-Pena-Flores
[[Image here]]
Pena-Flores was decided on February 25, 2009.
Although the number of consent searches by municipal departments increased by nearly 100 from April 2012 to April 2013, the Report states that this increase reflects better reporting by police departments, rather than an increase in the actual number of consent searches. Pena-Flores Report, supra, at 15.

 Automobile Search Warrant Requests Made by State Police
Pre-Pena-Flores Post-Pena-Flores
_ _
[[Image here]]
Automobile Search Warrant Requests Made by Municipal Departments
Pre-Pena-Flores__Post-Pena-Flores_____
[[Image here]]

 Warrantless Automobile Searches Based on Probable Cause
Pre-Pena-Flores Post-Pena-Flores
April 2008 April 2009 April 2010 April 2011 April 2012 April 2013 Municipal Departments State Police 174
Prior to April 2012, the State Police did not keep measurable statistics in this category. Pena-Flores Report, supra, at 32.

 See, e.g., Steph Solis, Seaside Heights Man Charged with DWI After Crashing into Brick Patrol Car, Asbury Park Press, June 26, 2015, at 9A (police officer hospitalized after intoxicated driver crashed into his patrol car during course of traffic stop); Abbott Koloff, School Van Driver Dies in GSP Accident, Bergen Record, July 24, 2014, at L-2 (man killed, two others injured, when vehicle struck car and three pedestrians on Parkway grassy median); Stephen Stirling, Two Officers Injured in Roadside Accident, Star-Ledger, July 20, 2014, at 17 (two police officers injured, one suffering broken ribs and “severe cuts to the head and face,” after driver crashed into two patrol cars during traffic slop); Stefanie Dazio & Christopher Maag, Driver Charged in Crash that Killed Cop, Bergen Record, July 18, 2014, at A-l (police officer killed while operating radar on shoulder when rear-ended by tractor-trailer); Monroe Officer Hit by SUV, Injured, Courier-Post, June 24, 2014, at 4A (police officer suffered broken leg and knee injury after intoxicated driver crashed into him during course of traffic stop).

 We do not suggest that under appropriate circumstances an inventory of a car at headquarters cannot be undertaken pursuant to State v. Slockbower, 79 N.J. 1, 397 A.2d 1050 (1979), and State v. Ercolano, 79 N.J. 25, 397 A.2d 1062 (1979), or that the police cannot undertake a search based on a true exigency.