# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0309-21

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

P.R.,

     Defendant,

and

Q.J.,

     Defendant-Appellant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF
J.M.R., a minor.

_____

Submitted September 20, 2022 – Decided October 3, 2022

Before Judges Messano and Rose.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Essex County, Docket No. FG-07-0026-21.

Joseph E. Krakora, Public Defender, attorney for appellant (Beth Anne Hahn, Designated Counsel, on the briefs).

Matthew J. Platkin, Acting Attorney General, attorney for respondent (Sookie Bae, Assistant Attorney General, of counsel; Wesley Hanna, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Noel C. Devlin, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

Defendant Q.J. appeals from the Family Part's September 9, 2021 order terminating his parental rights to his daughter, J.M.R. (Jasmine), who was born in August 2019.[1] Defendant contends the evidence adduced by the Division of Child Protection and Permanency (the Division) as to each prong of the statutory best-interests-of-the-child test, N.J.S.A. 30:4C-15.1(a), was insufficient. He also presents the following three arguments for the first time on appeal: 1) COVID-19 protocols and Executive Orders affecting in-person visits at the

---

[1] We use initials and pseudonyms pursuant to Rule 1:38-3(d)(12).

Essex County Correctional Facility (ECCF), where defendant was incarcerated at the time of Jasmine's birth and during the entire guardianship proceedings, violated his fundamental rights under the United States and New Jersey Constitutions; 2) the judge "fixat[ed]" on defendant's decision to withdraw his previously entered guilty plea on the pending criminal charges, thereby depriving defendant of his due process rights; and 3) his trial counsel provided ineffective assistance. See N.J. Div. of Youth & Fam. Servs. v. B.R., 192 N.J. 301, 307 (2007) (applying standard adopted in Strickland v. Washington, 466 U.S. 668, 694 (1984), and approved by our Supreme Court in State v. Fritz, 105 N.J. 42, 58 (1987)).

The Division argues the judgment is supported by "overwhelming evidence" as to all prongs of the statutory best interests standard, and defendant received effective assistance from counsel.[2] Jasmine's Law Guardian also urges us to affirm the judgment, specifically arguing defendant was not "unfairly affected" by COVID-19 restrictions, the judge did not penalize defendant for electing to withdraw his guilty plea, and defendant received effective assistance of counsel.

---

[2]  The Division does not specifically address the other points raised by defendant.

A-0309-21

Having considered the arguments in light of the record and applicable legal standards, we affirm.

I.

Clara Maass Medical Center made a referral to the Division the day after Jasmine's birth, expressing concern over the ability of the child's mother, P.R. a/k/a/ P.M.R. (Patti), to care for her. Following a psychological evaluation that confirmed those worries, the Division filed its complaint for care and custody of Jasmine, and the court granted the request. The Division placed Jasmine with her maternal aunt and uncle, W.M. and L.M. (the Mercers). Jasmine has lived with the Mercers ever since, along with her brother, J.R.[3]

Patti told the Division defendant was Jasmine's father. The Division offered defendant the opportunity to take a DNA test to confirm his paternity when the caseworker first spoke with defendant at the ECCF.[4] Defendant explained he and Patti dated on and off since 2018, and while he was possibly Jasmine's father, defendant did not think he could father a child. He explained

---

[3] Patti gave birth to J.R. in 2018; defendant is not the child's father. Patti executed an identified surrender of J.R. in favor of the Mercers in a separate, earlier guardianship proceeding. On January 20, 2021, Patti executed an identified surrender of Jasmine to the Mercers.

[4] DNA testing confirmed defendant was Jasmine's father in November 2019.

A-0309-21

that he slept with many women, none of whom ever became pregnant. Defendant also told the caseworker he did not think he would resume a relationship with Patti when released and, although he would participate in services provided by the Division, he did not want visitation with Jasmine at the jail and would rather wait until his release. Defendant identified his mother as a placement resource.

Although the judge ordered the Division to facilitate Jasmine's visitation with defendant at the ECCF, it is undisputed that by March 2020, no visits had occurred. The judge re-issued an order requiring the Division to "provide make-up visits for December, January, and February for [defendant] twice per month," however, before any visits took place, the ECCF suspended all in-person visitation because of the COVID-19 pandemic and instead offered each inmate "free daily [five]-minute phone calls." The judge's June 2020 order noted defendant was "visiting" Jasmine via phone calls from the ECCF.

In August 2020, with visitation at the ECCF still suspended, the judge approved the Division's permanency plan of termination followed by adoption. The judge noted in his order that defendant had been incarcerated since April

A-0309-21

2019 on charges of conspiracy and robbery, and "defendant report[ed] he was sentenced to five years."[5]

The judge initially set a trial date for May 4, 2021, which was postponed when the judge noted defendant refused to enter the van intended to transport him to court. The guardianship trial took place instead on September 9, 2021.

The Division called two witnesses: Dr. Eric Kirschner, a clinical psychologist, as its expert; and Division caseworker Jelisa Amparo. Dr. Kirschner interviewed defendant via Zoom. He was unable to administer psychological tests because defendant refused to complete the test materials. Defendant told Dr. Kirschner that he planned to reunite with Patti upon release from custody and start a life together with her and Jasmine. However, defendant also told the doctor that "he ha[d] three or four females that he [wa]s involved in some type of relationship with[,] . . . noted . . . they all received social security benefits and . . . referred to them as his crew." Dr. Kirschner characterized this as:

> there was a very much manipulative sort of deceptive
> or deceitful quality to it, by all indications it looked to

---

[5] Confusion lingered regarding defendant's pending criminal cases. We explained the charges defendant faced and what occurred in the Criminal Part in our prior opinion affirming the criminal trial judge's December 2020 order permitting defendant to withdraw his guilty pleas. State v. Q.J., No. A-1453-20 (App. Div. July 15, 2021) (slip op. at 2–5).

A-0309-21

me as though he was really kind of preying on what are presumably vulnerable individuals who are . . . receiving some type of state benefits for whatever reason and there's really just sort of, by all indications, . . . financial gain that they can provide to him.

Dr. Kirschner opined that defendant had "serious and significant emotional . . . problems," "exhibited highly aggressive and violent behaviors over a period of time," and defendant's mental health history of bipolar disorder and antisocial personality disorder, together with defendant's non-compliance with mental health services, led Dr. Kirschner to conclude defendant was unable to meet Jasmine's needs. The doctor opined it was unlikely that defendant would be able to parent in the future and noted defendant and Jasmine have "no relationship to speak of." Dr. Kirschner said termination of defendant's parental rights would not do more harm than good, because Jasmine would suffer "no emotional or psychological trauma or impact" from termination, which would allow for the child's permanent placement with the Mercers.

Amparo detailed the difficulties in the Division's attempts to facilitate visitation between defendant and Jasmine and admitted no in-person visitation had occurred. Amparo attempted to set up a regular time—every Saturday at 10:00 a.m.—for defendant to call the Mercers and speak with Jasmine, but, according to W.M., defendant never called at the designated time. The judge

7

asked if defendant ever called; Amparo confirmed the Mercers said, there was "no contact in February, March, April, May, June, July, August, September [2020], [and defendant] made no attempts even though it was arranged for him to make those calls." Amparo said the Mercers intended to adopt Jasmine.

When asked what services the Division provided defendant, Amparo reiterated the inability to conduct in-person visits, but noted the Division assessed other relatives as placement alternatives, monitored services provided to defendant at the ECCF, and provided medication. However, Amparo said defendant was unable to participate in any services at the jail because of restrictions in his housing unit and was non-compliant with his medication regimen.

Amparo confirmed defendant offered his mother and father as possible placement resources. However, because defendant's mother had an open case with the Division, she was rejected, and defendant's father said he was unable to serve because of his work schedule.[6]

Defendant did not testify or call any witnesses.

---

[6] The Division did not order a bonding evaluation between defendant and Jasmine because, according to Amparo, "[i]t didn't make . . . sense" since defendant and Jasmine had never met.

II.

When the State seeks to terminate parental rights, the Division must prove by clear and convincing evidence each of the following:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm;
>
> (3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
>
> (4) Termination of parental rights will not do more harm than good.
>
> [N.J.S.A. 30:4C-15.1(a); see also In re Guardianship of K.H.O., 161 N.J. 337, 347–48 (1999).]

"The focus of a termination-of-parental-rights hearing is the best interests of the child." N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 447 (2012) (citing N.J. Div. of Youth & Fam. Servs. v. R.D., 207 N.J. 88, 110 (2011)). The four statutory prongs "are neither discrete nor separate. They overlap to provide a composite picture of what may be necessary to advance the best interests of the children." N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 280

(2007) (quoting N.J. Div. of Youth & Fam. Servs. v. F.M., 375 N.J. Super. 235, 258 (App. Div. 2005)).

An order terminating parental rights is enrobed in a double layer of deference. We defer to the judge's factual findings because he had "the opportunity to make first-hand credibility judgments about the witnesses . . . [and] ha[d] a 'feel of the case' that can never be realized by a review of the cold record." Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008) (quoting M.M., 189 N.J. at 293). Secondly, we accord additional deference to the Family Part's factual findings because of its "special jurisdiction and expertise in family matters." N.J. Div. of Youth & Fam. Servs. v. M.C. III, 201 N.J. 328, 343 (2010) (quoting Cesare v. Cesare, 154 N.J. 394, 413 (1998)).

"Only when the trial court's conclusions are so 'clearly mistaken' or 'wide of the mark' should an appellate court intervene and make its own findings to ensure that there is not a denial of justice." E.P., 196 N.J. at 104 (quoting N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 605 (2007)). "However, '"where the focus of the dispute is . . . alleged error in the trial judge's evaluation of the underlying facts and the implications to be drawn therefrom," the traditional scope of review is expanded.'" M.M., 189 N.J. at 279 (quoting In re Guardianship of J.T., 269 N.J. Super. 172, 188–89 (App. Div. 1993)).

## A.

"The first two prongs [of N.J.S.A. 30:4C-15.1(a)] . . . are 'the two components of the harm requirement' and 'are related to one another.'" N.J. Div. of Child Prot. & Permanency v. T.D., 454 N.J. Super. 353, 380 (App. Div. 2018) (quoting In re Guardianship of D.M.H., 161 N.J. 365, 379 (1999)). "Therefore, 'evidence that supports one informs and may support the other as part of the comprehensive basis for determining the best interests of the child.'" Ibid. (quoting D.M.H., 161 N.J. at 379). Under the first prong, "the Division must prove harm that 'threatens the child's health and will likely have continuing deleterious effects on the child.'" N.J. Dep't of Child. & Fams. v. A.L., 213 N.J. 1, 25 (2013) (quoting K.H.O., 161 N.J. at 352). The Division need not "wait 'until a child is actually irreparably impaired by parental inattention or neglect.'" F.M., 211 N.J. at 449 (quoting D.M.H., 161 N.J. at 383). Under prong two, "the inquiry centers on whether the parent is able to remove the danger facing the child." Id. at 451 (citing K.H.O., 161 N.J. at 352).

As to prong one, in his oral opinion that immediately followed trial, the judge was "satisfied that [Jasmine] has been and will continue to be harmed by [defendant's] physical absence, lack of psychological resources to support her needs for stability, guidance, safety, and nurturance now and in the future." As

to prong two, the judge found defendant made no effort to engage in rehabilitative services while at the ECCF and was noncompliant with his medication regimen. Defendant contends his absence from Jasmine's life, due to his incarceration, did not, alone, satisfy prong one, nor does his continued incarceration support an inference that he is unwilling or unable to eliminate any alleged harm.

We agree that incarceration alone is insufficient to prove parental unfitness or abandonment and terminate parental rights, but incarceration is indeed "probative of whether the parent is incapable of properly caring for . . . or has abandoned the child." In re Adoption of Child. by L.A.S. 134 N.J. 127, 136–37 (1993). When dealing with an incarcerated parent, relevant factors to consider include the nature of the underlying crime leading to the incarceration and the effect of incarceration on the child, with consideration given to the parent's attempts to communicate and have a relationship with the child during their incarceration and the level of concern displayed by the parent as to the child's well-being. See id. at 143–44. The judge appropriately considered these factors in detail.

Defendant's reliance on N.J. Div. of Youth & Fam. Servs. v. R.G. is misplaced. 217 N.J. 527 (2014). There, the Court found that the Division failed

to show by clear and convincing evidence that the defendant's incarceration caused harm to his daughter, or that he was unwilling to eliminate that harm, crediting evidence that the defendant "effectively parented" his daughter before his incarceration and maintained a relationship with her via telephone and letters even though he only saw her once in six years.  Id. at 560–61.

This case is more akin to the facts in N.J. Div. of Youth & Fam. Servs. v. T.S., 417 N.J. Super. 228 (App. Div. 2010).  There, we concluded the Division had met its burden, given the defendant-father's lack of any relationship with his daughter, and any harm "could not be ameliorated by visitation or services because [the defendant] remained incarcerated throughout the litigation."  Id. at 243; see also L.A.S., 134 N.J. at 139 (stating "once a parent is imprisoned, a relationship with one's children that was nonexistent prior to incarceration will not likely be fostered").  To the extent we have not otherwise addressed them, defendant's remaining arguments regarding the prong one and two proofs lack sufficient merit to warrant discussion.  R. 2:11-3(e)(1)(E).

### B.

N.J.S.A. 30:4C-15.1(a)(3) requires the Division to make "reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home[,]" and the court to "consider[]

alternatives to termination of parental rights."  However, "[e]xperience tells us that even [the Division's] best efforts may not be sufficient to salvage a parental relationship."  F.M., 211 N.J. at 452.  The Court has acknowledged "providing services to incarcerated persons is difficult and may be futile," but it has cautioned "the Division should not avoid providing services to all incarcerated persons, regardless of their seeming unwillingness to improve their parental fitness."  R.G., 217 N.J. at 562.

Defendant contends the judge "exempted" the Division from providing services because of his incarceration, but this mischaracterizes the judge's opinion.  We acknowledge that the judge's findings on prong three were scant.  He noted the Division performed "psychological evaluations, paternity testing, assessed relatives for placement, and communicated with the jail social worker with the possible services," concluding these were reasonable efforts under the circumstances "focused on assisting [defendant] in rehabilitating himself to overcome those circumstances that necessitated the placement of [Jasmine] in foster care."  The Division and Law Guardian note that because Jasmine was a newborn infant, it was impossible for her to verbally communicate with defendant.

14

The only service the Division did not provide was in-person visits between defendant and Jasmine, which could not occur at the ECCF during the height of the COVID-19 pandemic. The Division bore no fault for defendant's incarceration, nor could the Division ameliorate the conditions causing defendant to be continuously incarcerated throughout Jasmine's young life. We have said that "[e]ven if the Division ha[s] been deficient in the services offered to" a parent, reversal is not necessarily "warranted, because the best interests of the child controls[]" the ultimate determination. N.J. Div. of Youth & Fam. Servs. v. F.H., 389 N.J. Super. 576, 621 (App. Div. 2007). This is such a case.

Defendant correctly notes the judge made no mention of prong three's requirement that the court consider alternatives to termination. However, the record demonstrates the Division ruled out defendant's mother because she had an open case with the Division and defendant's father expressed he was unable to care for the child because of his work schedule. See N.J. Div. of Youth & Fam. Servs. v. J.S., 433 N.J. Super. 69, 85 (App. Div. 2013) (noting N.J.S.A. 30:4C-12.1(b) grants the Division the authority to "rule out" relatives or friends whom the agency determines are unable or unwilling to assume care for the child or with respect to whom placement would not be in the child's best interest). In sum, the Division's prong three proofs were sufficient.

A-0309-21

Prong four "serves as a fail-safe against termination even where the remaining standards have been met." G.L., 191 N.J. at 609. "The question ultimately is not whether a biological mother or father is a worthy parent, but whether a child's interest will best be served by completely terminating the child's relationship with th[e] parent." E.P., 196 N.J. at 108. Typically, "the [Division] should offer testimony of a well[-]qualified expert who has had full opportunity to make a comprehensive, objective, and informed evaluation of the child's relationship with both the natural parents and the foster parents." F.M., 211 N.J. at 453 (quoting M.M., 189 N.J. at 281). However, expert testimony is not required in an instance involving "[a] common sense notion that [a] child will be more bonded with his [or her resource] parents than with [the] defendant." N.J. Div. of Youth & Fam. Servs. v. I.S., 202 N.J. 145, 182 (2010).

In this case, the judge found Dr. Kirschner's testimony to be persuasive, concluding

> [Jasmine] has been in her current resource home with the maternal great aunt and her half-brother . . . since her birth over a year and a half ago.
>
> . . . [T]ermination will permit [Jasmine] to be adopted by the maternal great aunt and thus no harm that may be done for termination of [defendant's] rights will outweigh the good that will come from the child's

16

> continued stability and permanency in a home with her sibling.

The Division met its burden under prong four.

### III.

We address defendant's remaining points. He first contends that because of COVID-19 restrictions at the ECCF, the governor, the Division, and Essex County "irretrievably impair[ed] imperative constitutionally-protected liberty interests and scores of centuries of societal family constructs in a discriminatory fashion." Defendant never made this argument, which appears to be a facial or as applied constitutional challenge to Executive Orders and regulations, to the trial judge. There is no record for us to review, and we decline the invitation to consider such a weighty argument for the first time on appeal. See State v. Witt, 223 N.J. 409, 419 (2015) ("For sound jurisprudential reasons, with few exceptions, 'our appellate courts will decline to consider questions or issues not properly presented to the trial court when an opportunity for such a presentation is available.'" (quoting State v. Robinson, 200 N.J. 1, 20 (2009))).

Defendant next contends, again for the first time, that the judge was biased. He argues the judge was fixated on defendant's successful withdrawal of his guilty plea and sought to "strong arm" defendant from proceeding to trial on the guardianship complaint.

17

The judge did opine on defendant's decision to withdraw his guilty pleas. However, taken in context, the judge was accurately explaining the impact defendant's decision had on the termination proceedings. Defendant asserted he would be able to take care of Jasmine when released. But, as the judge accurately noted, given the uncertainty of both the timing and result of defendant's criminal trials, his decision to withdraw his guilty pleas increased the uncertainty of when defendant would be released from custody as well as the length of his incarceration. In a pretrial hearing, the judge told defendant, "the Division is going to move forward with a trial where they have to prove by clear and convincing evidence that . . . your parental rights will be terminated. If . . . they are successful in that, you will have no right to say anything about where your child goes." The judge wanted defendant to be fully aware of the alternatives and the effect of choices he was about to make. It was not evidence of bias.

Lastly, defendant contends trial counsel provided him with ineffective assistance, claiming counsel lacked knowledge of applicable statutes, failed to object to hearsay testimony the Division introduced through Amparo, and never challenged the Executive Orders and COVID-19 protocols at the ECCF that restricted visits with Jasmine.

A-0309-21

In adopting the Strickland/Fritz standard, the Court held that to assert a successful ineffective assistance of counsel claim in guardianship litigation, a defendant must demonstrate: counsel's performance was objectively deficient—i.e., it fell outside the broad range of professionally acceptable performance; and counsel's deficient performance prejudiced defendant—i.e., there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." B.R., 192 N.J. at 307 (quoting Strickland, 466 U.S. at 694).

As to the first prong, "in addition to being 'highly deferential,' 'a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" Id. at 307–08 (quoting Strickland, 466 U.S. at 689). Defendant fails to establish counsel was unaware of applicable statutes, or that her failure to raise a constitutional challenge demonstrates deficient performance affecting the outcome. As to the latter, an attorney is not deficient for failing to raise a losing argument at trial. State v. Echols, 199 N.J. 344, 361 (2009). Defendant fails to demonstrate that the constitutional claims had any merit.

Defendant broadly claims trial counsel never objected to documentary evidence admitted at trial even though "th[o]se exhibits were laden with hearsay,

A-0309-21

even double and triple hearsay," but he fails to cite which exhibits, much less whether the judge considered the alleged hearsay and whether its admission affected the judgment. We acknowledge that trial counsel did not object to hearsay admitted through Amparo's testimony, specifically the assertion that defendant never called W.M. to speak with Jasmine for many months. However, given the overwhelming evidence supporting termination, the exclusion of this testimony upon timely objection would not have affected the outcome.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

20                                                          A-0309-21