NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-3503-21

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

KEVIN B. BOONE, a/k/a
KEVIN BOONE, KEVIN
BELAL and KEVIN B.
BELAL,

    Defendant-Appellant.

_____

**APPROVED FOR PUBLICATION**

**July 24, 2024**

**APPELLATE DIVISION**

Argued February 7, 2024 – Decided July 24, 2024

Before Judges Accurso, Vernoia and Walcott-
Henderson.

On appeal from the Superior Court of New Jersey,
Law Division, Cumberland County, Indictment No.
20-12-0521.

Alyssa Aiello, Assistant Deputy Public Defender,
argued the cause for appellant (Jennifer Nicole Sellitti,
Public Defender, attorney; Alyssa Aiello, of counsel
and on the brief).

Jeffrey Krachun, Assistant Prosecutor, argued the
cause for respondent (Jennifer Webb-McRae,
Cumberland County Prosecutor, attorney; Jeffrey
Krachun, of counsel and on the brief).

The opinion of the court was delivered by

ACCURSO, P.J.A.D.

Following the denial of his motion to suppress evidence seized in a warrantless search after a car stop, defendant Kevin B. Boone entered a negotiated guilty plea to third-degree possession of a controlled dangerous substance, N.J.S.A. 2C:35-10(a)(1), and was sentenced to recovery court probation with an alternate sentence of five years in State prison. He appeals, raising, in essence, a single issue:

> POINT I
>
> THE TRIAL COURT ERRED IN DENYING SUPPRESSION BECAUSE THE STATE FAILED TO ESTABLISH THAT THE PRETEXTUAL MOTOR VEHICLE STOP WAS CONSTITUTIONALLY PERMISSIBLE AND THE CIRCUMSTANCES GIVING RISE TO PROBABLE CAUSE FOR THE VEHICLE SEARCH WERE UNFORESEEABLE AND SPONTANEOUS.
>
> A. Pretextual Motor Vehicle Stops Should No Longer Be Permitted In New Jersey.
>
> B. The State Failed To Carry Its Burden Of Establishing That Police Had A Reasonable And Articulable Basis To Stop Defendant's Vehicle For Failing To Maintain A Lane, In Violation Of N.J.S.A. 39:4-88b.
>
> C. [The detective's] testimony did not establish a reasonable and articulable basis to believe that a violation of N.J.S.A. 39:4-88(b) occurred.

D. In The Absence Of A Corroborative Mobile Video
Recording, The State Should Be Precluded From
Relying On A Minor Traffic Infraction As A Valid
Pretext For A Motor Vehicle Stop, Where The
Alleged Infraction "Fortuitously" Occurred While
Police Were Already Following The Vehicle With
The Express Intention Of Stopping It.[1]

E. The Automobile Exception Did Not Apply Because
The Circumstances Giving Rise To Probable Cause
Were Not Spontaneous and Unforeseeable.

We reverse. We agree the detective's testimony was not sufficient to establish he possessed a reasonable and articulable suspicion to stop defendant's vehicle for failing to maintain a lane, in violation of N.J.S.A. 39:4-88(b). Accordingly, we do not reach defendant's argument that the automobile exception did not apply because the circumstances giving rise to probable cause were not spontaneous and unforeseeable as required under State v. Witt, 223 N.J. 409, 447-48 (2015). See State v. Smart, 253 N.J. 156, 171 (2023).

As the State concedes, this case arose out of a pretext stop, which, generally speaking, does not render it illegal in New Jersey. See State v. Kennedy, 247 N.J. Super. 21, 28-29 (App. Div. 1991) (explaining "courts will not inquire into the motivation of a police officer whose stop of an automobile is based upon a traffic violation committed in his presence"; "that the

---

[1] The rebuttable presumption of N.J.S.A. 40A:14-118.5 did not take effect until after this stop, making it inapplicable at the suppression hearing. See State v. Jones, N.J. Super. 520, 530-31 (App. Div. 2023).

A-3503-21

justification for the stop was pretextual . . . [is] irrelevant"); State v. Bacome, 228 N.J. 94, 103 (2017) ("The objective reasonableness of police officers' actions — not their subjective intentions — is the central focus of federal and New Jersey search-and-seizure jurisprudence."); see also Whren v. United States, 517 U.S. 806, 813 (1996) (holding "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis").  Here are the facts adduced at the suppression hearing.

On a November evening in 2019, a canine officer was sitting in the Vineland police station watching the video feed from private surveillance cameras positioned around the building and parking lots of a nearby motel.[2]

---

[2] In the appendix is a single page form of the Vineland Police Department purporting to be a "Power of Attorney."  The form has a blank for the name and address of the motel and is signed by the manager.  It states:

> I hereby give the Vineland Police Department
> authority to enter onto the property indicated above,
> for the purpose of enforcing all criminal laws,
> disorderly persons offenses, city ordinance violations,
> etc., and to effect arrests and lodge complaints as
> deemed necessary.

The form states the Power will remain in effect for one year from execution, "or until such time as it is denounced in writing to the Chief of Police or his designee, whichever comes first."  The form makes it the owner/manager's "responsibility to reapply for this Power-of-Attorney, prior to its expiration date."

A-3503-21

The officer testified the motel was "a known spot for, you know . . . drug dealing, overdoses, prostitution out of there, fights, shots fired calls, that type of stuff."

A few minutes before midnight, the officer saw a GMC Yukon pull into the parking lot and watched while the driver, later identified as defendant Boone, got out and went up one of the outdoor staircases to a room on the second floor. According to the officer, Boone "was in the room maybe two minutes and then came right out and left again." The officer didn't see anything in Boone's hands going in or out of the room, didn't know Boone, wasn't surveilling the room Boone entered, and didn't recall sending a patrol unit over to investigate anything that might have been going on in the room Boone visited. Instead, believing Boone "was there to either purchase . . . or sell narcotics" based on his "training and experience," the officer radioed a

Nothing in the form, which is obviously not a power-of-attorney as the term is ordinarily understood, D.D.B. Interior Contracting, Inc. v. Trends Urban Renewal Ass'n. Ltd., 176 N.J. 164, 168 (2003), speaks to the police department's ability to monitor the motel's security cameras from the police station. There is nothing in the record as to whether patrons and their guests are advised they are under surveillance by the police. We were advised at oral argument that counsel were not aware of any Attorney General guidelines or other standards that govern the program.

detective stationed nearby to "[s]top the motor vehicle."[3] The officer then collected his dog and left the building to attend the stop.

The detective testified he was in a parking lot near the intersection of Landis Avenue and Delsea Drive when the canine officer alerted him to the Yukon. The detective spotted the vehicle and saw it go through the intersection traveling east on Landis. In response to questioning by the prosecutor, the detective testified the canine officer "alerted me to some observations he made. I followed the vehicle, observed a Title 39 violation, which was the reason I conducted the stop."

Under further questioning, the detective testified the canine officer "informed me that he had reasonable suspicion to believe [the Yukon driver] was engaged in narcotic activity." The detective admitted he and the canine officer "were looking for people involved in narcotic activity," and the canine officer had provided the detective with a description of the Yukon so he could "go make the stop." According to the detective, after receiving the radio transmission from the officer, it "was my intention to stop the vehicle." Asked

---

[3] Defense counsel asked the officer on cross-examination if he "would have told [the detective] to stop the vehicle regardless of whether or not Mr. Boone committed a traffic offense." The officer replied: "I did not say that. I would have told him that, you know, try and stop the vehicle. We — I know, generally we will see if there's any vehicle violations, but it's not a guarantee that you have to have a motor vehicle violation to stop it."

A-3503-21

by the prosecutor whether he formed that intention before or after he saw the Title 39 violation, which was the Yukon crossing the yellow line on a two-lane road, the detective replied: "[I]t was a combination of both."

The detective testified he followed the Yukon for about four tenths of a mile on Landis before it turned left onto North West Avenue, a two-lane road with a twenty-five miles per hour speed limit. According to the detective, he saw the Yukon "crossing the yellow line" as it traveled on North West. There was very little traffic owing to the hour and the "inclement weather." As the vehicle approached West Park Avenue, which is about another four tenths of a mile from where the Yukon turned off Landis, the detective called in the stop, activated his emergency lights to signal the driver to pull over and turned on his body worn camera. According to the detective, the traffic was very light, and it was dark and raining.

The detective got out of his car a minute after he called in the stop. The canine officer arrived at nearly the same time. The detective stood by the passenger window and advised Boone that "one reason" he stopped him was because the Yukon was "crossing the yellow this side of the road," to which Boone responded: "Oh!" When the detective asked Boone whether he "realize[d] that," Boone replied "Uh-uh-huh." The transcript thereafter notes "simultaneous speech" and Boone saying, over an indiscernible interruption, "I

7                                                                    A-3503-21

might have been in . . . here sitting here talking and. . . ." The detective followed up by asking: "You were talking? Weren't really paying attention too much?" Boone responded "Probably," to which the detective replied "Okay. No problem."

While the detective spoke to Boone and his passenger, the canine officer stood at the driver's door looking into the car, and he obtained Boone's license and registration. Boone told the detective the couple was headed home with groceries from the nearby Walmart, and the detective observed groceries in the back of the Yukon. When asked if he'd been anywhere else, defendant told the detective he'd stopped at the motel "for a split second" to talk with a friend there.

Boone was cooperative, and neither officer noticed any impairment on his part or any indication of drugs in the Yukon. Notwithstanding, the detective asked both Boone and his passenger to step out of the vehicle.[4] The detective read Boone his Miranda[5] rights. He also told Boone the officers had

---

[4] Charges against the passenger were ultimately dismissed, and she did not raise an issue about being asked for her identification or to step out of the car. See State v. Boston, 469 N.J. Super. 223, 265 (App. Div. 2021) (holding an officer's demand for identification from an unlicensed passenger in the absence of particularized suspicion is an unreasonable interference with the passenger's privacy).

[5] Miranda v. Arizona, 384 U.S. 436 (1966).

A-3503-21

watched him at the motel, a high crime area with "a lot of drug and narcotic activity," and thus the canine officer was going to run the dog "around the car." The detective did not conduct a pat-down search of Boone after removing him from the Yukon. The detective testified he had no basis to believe Boone was "armed and dangerous" and thus "no reasonable articulation to pat him down."

While the canine officer was conducting the car sniff, the detective checked Boone and his passenger for any open warrants, finding none. When the dog alerted to the smell of narcotics in the Yukon, Boone was arrested and handcuffed. A thorough search of his person revealed plastic bags of suspected cocaine and heroin in his waistband. A further search of the Yukon revealed a black bag in the back of the SUV. Inside, in addition to papers belonging to Boone, was a can of brake fluid. The can, which the officers testified had a false bottom, contained additional drugs.

Boone and his passenger were transported to the police station. The detective wrote out the traffic ticket for "unsafe lane change," N.J.S.A. 39:4-88(b), and Boone was detained on a complaint/warrant on various drug charges. His passenger was released on a summons and provided the keys to the Yukon, which had been parked, with Boone's permission, in a lot close to where he had been stopped.

9

Defense counsel's cross-examination of the detective centered on the motor vehicle violation. In his report of the incident, the detective wrote he saw the Yukon "swerving in the roadway" and noted it "crossed over the yellow line multiple times as it was traveling northbound on North West Avenue." At the suppression hearing, however, the detective did not testify the Yukon was swerving or moving erratically, and he could recall very little about the violation as evident in the following exchange with defense counsel.

> Q. You stated that — in your report at least, that Mr. Boone crossed the yellow line multiple times.
>
> A. Uh-huh.
>
> Q. Which occasioned you to effectuate a motor vehicle stop?
>
> A. Well, that wasn't the sole reason, but it's something I observed.
>
> Q. Okay. And, the — the erratic driving, which you observed, would have occurred entirely on the West Avenue?
>
> A. I wouldn't necessarily call it erratic driving; but, the violation . . . that I observed, yes, was on West Avenue.
>
> Q. Okay. And, I believe that in your report, and if you need your report to refresh your recollection we can certainly provide it to you, that Mr. Boone crossed over the line multiple times.
>
> A. Yes.

Q. How many times is multiple?

A. I don't know off the top of my head. More than once.

Q. Twice?

A. For me to say never would be guessing at this point. I don't recall; I know it was multiple times. There was more than once.

Q. Well, multiple times could be as few as two?

A. It could be; yes, it could.

Q. And, how far over the line did he go?

A. I don't remember how far over the line he went.

Q. It was raining that night?

A. Yes.

Q. It was obviously dark?

A. Yes.

Q. Are you able from looking at your pictures taken of West Avenue to determine where Mr. Boone crossed the yellow line?

A. At this point it would be guessing. If I didn't note it in my report specifically where it occurred, which is very hard to do. As a police officer when you're traveling behind somebody there's a lot going through your head. Not only are you focusing on the vehicle that you're going to stop, you're also listening to the police radio. You're paying attention to all your surroundings, other traffic, the weather conditions. What am I going to do. Is this guy going to try to

11

harm me? Is he going to be polite? Is he going to be cooperative? A lot going on. So, for me to say, specifically, this spot or that spot would be a complete guess. I observed the crossing, but again, I'm not looking to see what's the next intersection, what's the address of this road? So, you know, it's round about somewhere between Landis and Park I observed the crossing.

Q. So, it's your testimony that you have to guess in order to inform the court where the unlawful driving occurred? And, it's also your testimony that the time of the stop listed on the ticket was more of an approximation or guess than an accurate recording?[6]

A. I wouldn't say it was a guess. I would say that I can't specifically state where he crossed the line. I would — I would — as far as the time, I wasn't looking at the clock. So, I couldn't specifically state it's exactly this time.

The judge, in a very thorough and thoughtful written statement of reasons, denied Boone's motion to suppress. Noting "[t]he entire encounter" between the testifying officers and Boone was captured on their body worn cameras, although "[t]he alleged motor vehicle infraction was not," the judge developed a timeline of the events as the stop unfolded.

The judge found the detective "called in the stop at counter time 5:03:20" and got out of his car to speak with Boone exactly one minute later.

_____

[6] The prosecutor had already established with the witness that 12:27 a.m., the time of the violation listed on the ticket, was not the time of the Title 39 violation but the time the detective arrested Boone after the canine alerted to the odor of narcotics in the Yukon.

The detective asked Boone to step out of the Yukon at counter time 5:07:28 and stepped to the side of the road at 5:07:50. At 5:10:50, the canine officer asked Boone's passenger to step out of the car. The detective called dispatch for a warrant check at 5:11:40, a little over seven minutes after first speaking with Boone. The canine sniff began at 5:12:16, within eight minutes of the stop and ended two minutes later at 5:14:15, before dispatch advised at 5:14:29 that there were no warrants for either Boone or his passenger. Immediately thereafter, the detective advised Boone the dog had "hit on the car," and that the officers would search him, his car and his passenger. On discovering the plastic bag in Boone's waistband, the detective placed Boone in handcuffs at 5:19:30 and concluded his search of Boone's person six minutes later at 5:25:24.

Although having no doubt based on the testimony of the officers that the subjective reason for the car stop was a narcotics investigation, the judge found the detective credibly testified he'd pulled Boone over after witnessing a traffic offense. Acknowledging the violation was "not captured on a motor vehicle recording or . . . on the body worn cameras," the judge found the detective "testified to the same." The judge found the detective "polite and respectful during the course of his testimony," that he "answered the questions

posed directly," and "[h]is body language and demeanor were appropriate to the proceedings."

The judge also noted the video from the detective's body worn camera, although not capturing the violation, revealed the detective stated he'd pulled the Yukon over because it crossed the center line, and Boone tacitly admitted "that it could have occurred." Finding "[t]he objective reason behind the motor vehicle stop was for the violation of our motor vehicle laws," the judge concluded the stop was "constitutionally permissible."

And although finding the officers were without reasonable suspicion to prolong the stop for the dog sniff, noting Boone was "polite and cooperative," was not known to the officers, did not appear to be under the influence, that neither he nor his passenger made any furtive movements, and that the officers didn't see or smell contraband or witness a drug transaction or anything in Boone's hands at the motel, the judge found the law was clear the officers didn't need reasonable suspicion here because the sniff did not extend the stop. See State v. Dunbar, 229 N.J. 521, 538-39 (2017).

The judge also found the detective didn't need to call or wait for a canine unit to arrive because the canine officer was on the scene before the detective

had even finished speaking to Boone and obtaining his credentials.[7] The sniff commenced within eight minutes of the stop and took only two minutes to complete. The judge found it immaterial that the detective hadn't written the ticket until he'd returned to the stationhouse, as the sniff did not extend the time "that would have reasonably been required to effectuate the purposes of the stop."

The judge was also satisfied the positive indication from the dog provided probable cause for defendant's arrest, see State v. Cancel, 256 N.J. Super. 430, 433-34 (App. Div. 1992), and his ensuing search was thus a lawful incident thereto, see State v. Dangerfield, 171 N.J. 446, 461 (2002). Finally, the judge found the dog's indication of the odor of narcotics gave the officers probable cause to search the Yukon pursuant to State v. Alston, 88 N.J. 211, 230-31 (1981). The judge did not consider whether the actions of the officers "giving rise to probable cause were prompted by circumstances that were 'unforeseeable and spontaneous,' as required under Witt, 223 N.J. at 447-48." Smart, 253 N.J. at 159.

---

[7] The counters on the officers' body worn cameras would suggest the canine officer arrived at the place where Boone was stopped seventeen seconds before the detective. The detective denied that but could not say when the canine officer arrived.

Our standard of review on a motion to suppress evidence is well established. State v. Nyema, 249 N.J. 509, 526 (2022). We defer to the trial court's factual findings on the motion unless they were "clearly mistaken" or "so wide of the mark" that the interests of justice require appellate intervention, State v. Elders, 192 N.J. 224, 245 (2007) (internal quotations omitted), mindful it is the trial judge who saw the witnesses and heard them testify, see Trusky v. Ford Motor Co., Lincoln-Mercury Div., 19 N.J. Super. 100, 104 (App. Div. 1952) (likening the transcription of oral testimony to a dehydrated peach). Our review of the trial court's application of the law to the facts, however, is plenary. State v. Hubbard, 222 N.J. 249, 263 (2015).

Stated differently, although "a reviewing court should take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers," the trial court's "determinations of reasonable suspicion and probable cause should be reviewed de novo on appeal." Ornelas v. United States, 517 U.S. 690, 699 (1996).

Applying those principles here, we note we have no quarrel with the trial court's factual findings. The facts are undisputed. We disagree about what those facts mean for the constitutionality of this stop. Specifically, we conclude the trial court erred in finding the State put forth facts sufficient to

16                                                                              A-3503-21

establish the detective had reasonable articulable suspicion to stop Boone for failing to keep the Yukon "as nearly as practicable entirely within a single lane" in violation of N.J.S.A. 39:4-88(b).

N.J.S.A. 39:4-88, which applies to roadways that have "been divided into clearly marked lanes for traffic," provides in section (b) that "[a] vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from that lane until the driver has first ascertained that the movement can be made with safety."  Although section 88(b) has been part of our motor vehicle code since 1931, it had never been addressed in a published opinion before our former colleague Judge Ostrer, then sitting on the trial bench, issued his comprehensive assessment of the provision in State v. Woodruff, 403 N.J. Super. 620, 623 (Law Div. 2008).  After a scholarly review of how other courts had interpreted provisions comparable to ours, which is based on the Uniform Vehicle Code, see Unif. Vehicle Code § 11-309(a), reprinted in Traffic Laws Annotated, National Committee on Uniform Traffic Laws and Ordinances, U.S. Dep't of Transp. (1979), Judge Ostrer concluded the section imposes two independent requirements:  "First, a driver must, as nearly as practicable, drive within his single lane, in other words, maintain his lane.  Second, a driver may not change lanes until he can do so safely."

Although we later disagreed with <u>Woodruff</u> in an unpublished opinion, concluding section 88(b) described only one offense, not two, our Supreme Court agreed with Judge Ostrer that the provision "describes two separate and independent offenses, one for a driver's failure to maintain a lane to the extent practicable and the other for changing lanes without ascertaining the safety of the lane change." <u>State v. Regis</u>, 208 N.J. 439, 442 (2011). The Court also agreed with Judge Ostrer's view in <u>Woodruff</u> that the State need not establish that the driver's failure to maintain his lane risked the safety of other drivers, finding section 88(b) "is not limited to circumstances in which the deviation from the lane is demonstrated to be a danger to other drivers." <u>Id.</u> at 448.

Although the trial judge referred to Boone's alleged violation as an "unsafe lane change," there is no dispute that Boone was issued the ticket for failure to maintain a lane. And although the judge was satisfied the detective credibly testified he saw the Yukon cross the center line, that fact alone does not establish the violation. Section 88(b) is not a strict liability offense. The statute requires a driver to maintain his lane "as nearly as practicable." N.J.S.A. 39:88(b). <u>See</u> <u>Regis</u>, 208 N.J. at 449 n.3 (emphasizing "the Legislature qualified its mandate to remain in a single lane with the crucial phrase 'as nearly as practicable'"). The detective's testimony at the hearing was simply inadequate to permit the judge, as a matter of law, to determine

18

whether the detective possessed a reasonable suspicion that the statute had been violated.

As Judge Ostrer explained in Woodruff, "[t]he statute plainly does not make it a violation anytime a driver strays from a lane. If it is not practicable to maintain the lane, then a departure from lane is not a violation." 403 N.J. Super. at 627. Woodruff holds, and we agree, that "a driver must maintain a lane to the extent that a person may reasonably maintain the lane, given surrounding circumstances, such as road conditions, weather, vehicle condition, and vehicle size and lane width, and taking into account the skill that a reasonable driver, as opposed to a perfect driver, should have." Id. at 627-28.

Because "a stop founded on a suspected motor vehicle violation essentially is governed by the same case law used to evaluate a stop based on suspected criminal or quasi-criminal activity," State v. Golotta, 178 N.J. 205, 213 (2003), the officer conducting the stop must have a "particularized suspicion" based on objective observations that the driver has violated the traffic laws or has engaged in some criminal conduct, which "must be based upon the law enforcement officer's assessment of the totality of circumstances with which he is faced." State v. Davis, 104 N.J. 490, 504 (1986). The State is not required to prove the violation occurred. State v. Williamson, 138 N.J.

19                                                    A-3503-21

302, 304 (1994). "[T]he State need prove only that the police lawfully stopped the car, not that it could convict the driver of the motor-vehicle offense." Ibid. Nevertheless, "[t]he stop must be reasonable and justified by articulable facts; it may not be based on arbitrary police practices, [or] the officer's subjective good faith." State v. Coles, 218 N.J. 322, 343 (2014).

Because section 88(b) does not make every crossing of the center line a violation, the officer conducting a stop must have an articulable basis for concluding the driver failed to adhere to his single lane as nearly as practicable. See Williamson, 138 N.J. at 304 (holding an officer stopping a car for failure to signal a lane change "must have some articulable basis for concluding that the lane change might have an effect on traffic" as N.J.S.A. 39:4-126 requires a motorist to signal only "in the event any other traffic may be affected by such movement"). As Judge Ostrer held in Woodruff, "the lane maintenance statute requires 'a fact-specific inquiry into the particular circumstances present during the incident in question in order to determine whether the driver could reasonably be expected to maintain a straight course at that time in that vehicle on that roadway.'" 403 N.J. Super. at 628 (quoting United States v. Alvarado, 430 F.3d 1305, 1309 (10th Cir. 2005)).

As explained in Woodruff:

20

Based on such a fact-sensitive analysis, one or two deviations from a lane may or may not constitute a violation, depending on the circumstances. While it might not be reasonable to expect a driver to avoid even the slightest deviation from a lane over an extended distance, it may be reasonable to expect drivers to avoid a sudden, significant deviation from the lane or a sudden, over-compensating return back, absent physical obstacles, mechanical difficulty, or other uncontrollable circumstances. Moreover, even if it may be unreasonable to expect a driver on an empty road to avoid any slight deviation from a lane over an extended distance, it would be reasonable to expect drivers to avoid repeatedly deviating from the lane, although slightly, over a short distance.

[Id. at 629.]

The detective testified Boone's Yukon crossed the center line on North West Avenue more than one time but was not driving erratically. That is all the particulars the detective offered the court. He couldn't say where Boone crossed, how many times he crossed, or how far into the other lane he went each time. And although there is evidence in the record it was near midnight, dark and raining, that there was little to no traffic, the speed-limit was only twenty-five miles per hour and Boone was driving a fifteen-year-old, full-size SUV, there was no testimony about the width of the road or its condition.[8] Moreover, there is nothing in the record to allow the court to conclude the

---

[8] The detective's incident report in evidence notes the Yukon was from model year 2003.

A-3503-21

detective considered any of those things — or indeed, anything other than Boone's crossing the center line — in deciding to pull him over, notwithstanding "the number of lane departures is just one factor in determining whether a driver has adhered to a single lane as nearly as practicable."  Id. at 627.

We do not believe Boone's "tacit admission" that he may have crossed the center line changes the analysis.  First, of course, is that crossing the center line is, depending on the circumstances, not necessarily a violation of the statute.  Second, the detective did not advise Boone he'd seen the Yukon cross the line multiple times when Boone allowed he may have been talking with his passenger and not "really paying attention too much."  More serious is the detective's explanation for his inability to better describe what he believed to have been the violation — his candid admission that he was likewise distracted following the Yukon, "listening to the police radio. . . .  [P]aying attention to all [his] surroundings, other traffic, the weather conditions.  What [he was] going to do.  Is this guy going to try to harm me?  Is he going to be polite?  Is he going to be cooperative?  A lot going on."

The law is well settled that "[t]he suspicion necessary to justify a stop must not only be reasonable, but also particularized."  State v. Scriven, 226 N.J. 20, 37 (2016).  The detective's generalized statement that the Yukon

22

crossed the center line more than once without any particulars as to where, how many times, over what distance, how extensive the incursion or the effect of the darkness, the rain, the Yukon's size and the condition of the road on his assessment of the violation simply does not suffice here. Although inferences from the facts testified to will often suffice to establish reasonable suspicion for the violation, see, e.g., State v. Jones, 326 N.J. Super. 234, 239 (App. Div. 1999) (finding a trooper's testimony about the rush hour traffic conditions sufficed to support an articulable and reasonable basis for concluding the un-signaled lane change might have affected other cars), the only facts the detective could offer here were wholly insufficient to establish reasonable suspicion of the violation, see Williamson, 138 N.J. at 304-06 (finding an officer offered no articulable basis for concluding "the lane change might have an effect on traffic").

It was the State's obligation to put forth facts at the suppression hearing to establish the detective had "a 'particularized suspicion' based upon an objective observation" that Boone had violated section 88(b), which it patently failed to do. See Davis, 104 N.J. at 504. To the extent the detective believed that a motorist crossing the center line was sufficient to establish a violation of section 88(b), he was incorrect. See Regis, 208 N.J. at 449 n.3 (describing the provision's "as nearly as practicable" language as a "crucial phrase" qualifying

23                                    A-3503-21

the Legislative mandate that motorists "remain in a single lane"); see also State v. Carter, 247 N.J. 488, 532 (2021) (declining "to adopt a reasonable mistake of law exception under the New Jersey Constitution").

We do not question the detective's good faith or impugn the trial court's finding that he was a credible witness. Neither is enough, however, to justify this stop. See State v. Shaw, 213 N.J. 398, 411 (2012) (observing "an officer's hunch or subjective good faith — even if correct in the end — cannot justify an investigatory stop or detention"). The trial judge thoughtfully considered and conscientiously addressed the issues presented by this stop and search. The detective simply failed to offer facts sufficient, as a matter of law, to allow the court to determine he possessed a reasonable suspicion that Boone failed to maintain his lane "as nearly as practicable." N.J.S.A. 39:88(b).[9]

Because we conclude the motor vehicle stop conducted in this case did not meet constitutional requirements, we reverse the order denying defendant's

---

[9] Although the Court in Williamson remanded for the trial court to determine whether the trooper had a reasonable and articulable suspicion that the "defendant's failure to signal may have affected other traffic," the Court made clear the issue, which was essential to determine whether the trooper had an objective basis to believe the violation had occurred, had not been addressed at the hearing. 138 N.J. at 303-06. To the extent the "as nearly as practicable" factors were not specifically addressed at the suppression hearing in this matter, it was because the detective could not recall any details of the stop. See State v. Rice, 115 N.J. Super. 128, 132 (App. Div. 1971) ("[N]o sound reason exists in this case to give the State a second chance to bolster its proofs," it presumably "presented all its proofs at the suppression hearing").

suppression motion and remand for suppression of the evidence and further proceedings not inconsistent with this opinion. Our disposition makes it unnecessary to address defendant's remaining issues. We do not retain jurisdiction.

Reversed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-3503-21