**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0025-24

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

PERRY A. WILCOX, a/k/a
PERRY WILCOX,

     Defendant-Appellant.

_____

     Submitted May 20, 2026 – Decided June 25, 2026

     Before Judges Currier and Berdote Byrne.

     On appeal from the Superior Court of New Jersey, Law Division, Cumberland County, Indictment Nos. 19-10-0966, 20-12-0469, and 20-12-0470.

     Jennifer N. Sellitti, Public Defender, attorney for appellant (Nadine Kronis, Assistant Deputy Public Defender, of counsel and on the briefs).

     Jennifer Davenport, Attorney General, attorney for respondent (Sarah D. Brigham, Deputy Attorney General, of counsel and on the briefs).

Appellant filed a supplemental brief on appellant's behalf.

PER CURIAM

Defendant Perry A. Wilcox appeals from the order denying his motion to suppress evidence seized during a warrantless search of his vehicle. The underlying facts arise from a motor vehicle stop in Vineland during which police, who had prior knowledge of defendant through a confidential informant (CI), observed a suspected drug transaction and subsequently stopped defendant's vehicle after he committed a traffic violation. Following defendant's arrest for obstruction, a K-9 unit conducted an exterior sniff of the vehicle and alerted positively, after which officers searched the vehicle without a warrant.

Defendant argues the warrantless search was unlawful because the circumstances giving rise to probable cause were not spontaneous and unforeseeable as required by New Jersey's automobile exception[1] to the warrant requirement. We agree. The record establishes the officers made the decision to dispatch the K-9 unit before they stopped the vehicle, for the express purpose of transforming preexisting suspicions into probable cause. These facts are substantially similar to those in State v. Smart, 253 N.J. 156 (2023), where our

---

[1] To the extent other exceptions may apply, the parties limited their arguments on appeal to the automobile exception.

2

A-0025-24

Supreme Court found the automobile exception did not apply and a warrant was required before the vehicle could be searched.  We therefore reverse the denial of defendant's motion to suppress and remand for further proceedings.

I.

On December 20, 2018, Detectives James Day and Joshua Sheppard of the Vineland Police Department (VPD) were conducting surveillance of a house in the area of East Avenue and Grape Street in an unmarked vehicle as part of a narcotics investigation unrelated to defendant.  During this surveillance, the detectives observed defendant driving a white Chevrolet Traverse.  Day was familiar with defendant from a prior police encounter during which a handgun was found in defendant's vehicle, and both Day and Sheppard had received information from CIs several months earlier claiming defendant was distributing narcotics.  According to the detectives' testimony, defendant's Chevy pulled over, and Luke Niederberger, known to the detectives as a drug user and dealer based on CI information, got into the car before exiting a couple of minutes later.  Sheppard testified he and Day suspected defendant and Niederberger had conducted a drug transaction in the car based on prior knowledge of both individuals, though neither observed a hand-to-hand exchange.

A-0025-24

After Niederberger exited the vehicle and defendant drove away, the detectives redirected their attention from the Grape Street investigation to follow defendant. Day contacted Detective-Sergeant Antonio Ramos over the radio to seek permission to shift from the planned surveillance. Sheppard testified they told Ramos they were planning to follow defendant to "see if [they] could get a motor vehicle infraction" and stop him to "further the investigation." He further testified he and Day "were on the same page that [they] didn't want this to get away from [them] since it . . . just occurred in front of [them]," mentioning "the previous information that [they] had on both subjects." Ramos directed the detectives to call a K-9 unit and stated the K-9 Officer would perform the stop.

VPD K-9 Officer Louis Platania was contacted by Day and an audio recording of the radio communications was admitted in evidence at the suppression hearing. Ramos testified he was aware that defendant did not have a valid driver's license at the time, but the detectives did not immediately initiate a stop because they "were conducting an investigation at that point" and wanted to "find out where he was headed." Ramos further testified, as a narcotics investigator, he "wanted to see where [defendant] was going, if he was going to make another deal or if he was going to his supplier or where he was going at that point." The detectives determined they would wait for a traffic violation

A-0025-24

before stopping defendant. On cross-examination, Sheppard was asked whether "the whole purpose of the motor vehicle stop was so that Platania could do the sniff," to which he responded, "[c]orrect."

Shortly after the detectives began following defendant, he drove through a Dunkin Donuts parking lot to avoid a red traffic light, which the detectives identified as a violation of N.J.S.A. 39:4-66.2. Defendant continued driving before turning into an apartment complex and parking in a spot visible from the road. Although Ramos had directed the K9 Officer to initiate the stop, Ramos was the first officer in a marked vehicle to arrive at the apartment complex, so he initiated the stop. The motion judge found, crediting Day's testimony, "the only law enforcement determination that had been made was that there should be issuance of a motor vehicle ticket to [defendant]."

Defendant exited his vehicle, locked it with his key fob, and walked away from the officers with his hand in his jacket pocket. Sheppard identified himself as police, displayed his badge, and ordered defendant to return to his vehicle, but defendant continued walking backward, stating "this ain't no car stop." The detectives repeatedly ordered defendant to remove his hands from his pockets and return to the vehicle; when he refused, Sheppard and Day drew their

5

weapons and ordered defendant to the ground. Defendant removed his hand from his pocket but continued walking away.

Officer Platania arrived with K-9 Agir, a dual-purpose dog trained in both apprehension and narcotics detection. The State contends Platania initially deployed Agir for apprehension purposes, returning the dog to his vehicle once Sheppard had taken defendant to the ground, handcuffed him, and placed him under arrest for obstruction. The motion judge credited Platania's testimony that the purpose of requesting the K-9 assistance was not to conduct a narcotics sniff, but rather for assistance with apprehension. A search of defendant incident to arrest revealed a cell phone, car keys, and over $1,000 in cash.

At Detective Day's direction, Platania retrieved Agir and, within approximately one minute of defendant's arrest, conducted an exterior K-9 sniff of the locked vehicle. Agir alerted positively at the driver's side door.

After the positive alert, Ramos looked through the vehicle window and observed white powder scattered on the seats and floors, initially believing it to be powder cocaine. The officers used defendant's key fob to unlock the vehicle, searching it without obtaining a warrant. The white powder proved to be carpet cleaner, which the officers believed was used as a masking agent to interfere with K-9 detection. The search yielded a loaded handgun inside a bookbag

6

behind the driver's seat and a black bag containing fentanyl, heroin, crack cocaine, assorted pills, and methamphetamine. The vehicle was towed to an impound lot, and defendant was later issued motor vehicle tickets for avoiding a traffic control signal and driving with a suspended license, which were admitted in evidence at the hearing.

II.

A Cumberland County Grand Jury returned an indictment (first indictment) charging defendant with the following: second-degree distribution of methamphetamine, in violation of N.J.S.A. 2C:35-5(b)(9); third-degree possession of methamphetamine, in violation of N.J.S.A. 2C:35-10(a)(1); second-degree unlawful possession of a handgun, in violation of N.J.S.A. 2C:39-5(b)(1); second-degree possession of a weapon while committing a CDS offense, in violation of N.J.S.A. 2C:39-4.1(a); fourth-degree possession of a large-capacity ammunition magazine, in violation of N.J.S.A. 2C:39-3(j); and second-degree certain persons not to have weapons, in violation of N.J.S.A. 2C:39-7(b)(2). Two additional indictments were brought against defendant, (second and third indictments), which are unrelated to the traffic stop at issue in this appeal.

7

A-0025-24

Defendant filed a motion to suppress, challenging the warrantless search of his vehicle in connection with the first indictment. After evidentiary hearings, the court denied defendant's motion, finding the warrantless vehicle search valid pursuant to the automobile exception to the warrant requirement.

The court reasoned probable cause arose spontaneously and unforeseeably from the positive K-9 alert, given that detectives had been patrolling for an entirely unrelated matter, stopped defendant only for a traffic violation, and had observed no hand-to-hand transactions, resulting in police having "no expectation to find CDS." The court explained "none of these events were based on the officers' belief that defendant had drugs in his vehicle." The court further found deployment of the K-9 "does not indicate foreseeability," as it was initially called to assist with a resisting suspect, not to conduct a drug sniff. The court found it "unforeseeable that defendant would show up that day, avoid the light, ignore police orders once stopped, be arrested for obstruction, searched, and then have his vehicle sniffed by a K-9 who alerted police to the presence of CDS."

Prior to the beginning of jury selection, defendant entered a global plea agreement, resolving all three pending matters. He pleaded guilty to second-degree unlawful possession of a handgun under the first indictment, first-degree

A-0025-24

maintaining or operating a CDS production facility under the second indictment, and first-degree PWID cocaine under the third indictment. The State agreed to dismiss all remaining charges across the three indictments.

Defendant was sentenced in accordance with the plea agreement to fifteen years' imprisonment with a seven-and-one-half year period of parole ineligibility under the third indictment. Defendant received a concurrent term of ten years with five years of parole ineligibility under the second indictment. For the first indictment, at issue in this appeal, defendant received a concurrent term of eight years with three-and-one-half years of parole ineligibility. Defendant is thus serving an aggregate sentence of fifteen years imprisonment subject to a seven-and-one-half year parole disqualifier across all three indictments. This appeal followed.

### III.

Generally, our review of a trial court's decision on a suppression motion is circumscribed and deferential following a testimonial hearing. See State v. Fenimore, 261 N.J. 364, 372-73 (2025) (reiterating appellate courts defer to a trial court's factual findings when they "are supported by sufficient credible evidence in the record" (quoting State v. Elders, 192 N.J. 224, 243 (2007))). "A trial court's legal conclusions, 'however, and the consequences that flow from

established facts,' are reviewed de novo." State v. Bullock, 253 N.J. 512, 532 (2023) (quoting State v. Hubbard, 222 N.J. 249, 263 (2015)).

The Fourth Amendment of the United States Constitution and Article I, Paragraph 7 of the New Jersey Constitution protect against "unreasonable searches and seizures" and generally require a warrant issued upon "probable cause." U.S. Const. amend. IV; N.J. Const. art. I, ¶ 7. "[A] warrantless search is presumptively invalid" unless the State establishes the search falls into "one of the 'few specifically established and well-delineated exceptions to the warrant requirement.'" State v. Edmonds, 211 N.J. 117, 130 (2012) (quoting State v. Frankel, 179 N.J. 586, 598 (2004)).

When a defendant moves to suppress evidence seized without a warrant, the State bears the "burden, by a preponderance of the evidence, to establish" an exception to the warrant requirement applies, and "the warrantless search or seizure of an individual was justified in light of the totality of the circumstances." State v. Bard, 445 N.J. Super. 145, 155-56 (App. Div. 2016) (citing Illinois v. Gates, 462 U.S. 213, 238 (1983)). "[T]he 'touchstone' for evaluating whether police conduct has violated constitutional protections is 'reasonableness.'" Id. at 157 (quoting State v. Hathaway, 222 N.J. 453, 476 (2015)). "The reasonableness of police conduct is assessed with regard to

circumstances facing the officers, who must make split second decisions in a fluid situation." Ibid.

To conduct a search pursuant to the automobile exception to the warrant requirement, the State must satisfy the test set forth in State v. Witt, 223 N.J. 409, 446-48 (2015), "pro[of] that probable cause to believe the vehicle contains contraband or other evidence of unlawful activity arose spontaneously and unforeseeably." State v. Courtney, 478 N.J. Super. 81, 93 (App. Div. 2024) (citing Witt, 223 N.J. at 446-48). The requirements of unforeseeability and spontaneity ensure police "could not sit on probable cause and later conduct a warrantless search, for then the inherent mobility of the vehicle would have no connection with a police officer not procuring a warrant." Witt, 223 N.J. at 431-32. Thus, "police officers who possess probable cause well in advance of an automobile search should get a warrant." Smart, 253 N.J. at 174 (citing Witt, 223 N.J. at 431).

Although pretextual stops are generally permissible so long as the stop is objectively justified by a traffic violation, State v. Boone, 479 N.J. Super. 193, 197 (App. Div. 2024), the underlying reason for the stop may be relevant when analyzing whether the circumstances giving rise to probable cause for a warrantless automobile search were "spontaneous and unforeseeable." See

Smart, 253 N.J. at 171-72. "[W]hether the circumstances giving rise to probable cause were unforeseeable and spontaneous is a fact-sensitive inquiry that should be analyzed case by case." Id. at 173. "Probable cause is a well-grounded suspicion that a criminal offense has been or is being committed." State v. Hammer, 346 N.J. Super. 359, 366 (App. Div. 2001); see also State v. Burnett, 42 N.J. 377, 387 (1964). "Whether probable cause existed is to be determined by the objective reasonableness standard." State v. Judge, 275 N.J. Super. 194, 201 (App. Div. 1994).

The existence of probable cause to search the vehicle is not in dispute. The question before us is whether that probable cause arose from spontaneous and unforeseeable circumstances. The trial court reasoned probable cause arose spontaneously and unforeseeably from the positive K-9 alert because, among other things, police had "no expectation to find CDS" and "none of these events were based on the officers' belief that defendant had drugs in his vehicle." That conclusion is irreconcilable with the record.

Each of the four officers who testified at the suppression hearing had a pre-existing familiarity with defendant, stemming from past encounters, prior arrests, other narcotics investigations, or "long-held information" from CIs linking him to drug distribution. Detective Sheppard testified, after observing

12

defendant's encounter with Niederberger, he and Day made the decision to cease their prior surveillance of the house and follow defendant's vehicle, motivated both by what had "just occurred in front of" them and by "the previous information that [they] had on both subjects." Sheppard elaborated "the most important thing" they took into account was the CI information they already possessed "pertaining to them both selling narcotics," and confirmed, at that point, they "had a suspicion something went on dealing with narcotics inside that vehicle" although they had not witnessed it. Sheppard confirmed the detectives "decided in the vehicle" they "were going to stop [defendant]" and were "waiting for a [traffic] violation." Furthermore, Sheppard agreed "the whole purpose of the motor vehicle . . . stop was so that Platania could do the sniff."[2]

Defendant argues these facts are "nearly identical" to those of Smart. In Smart, police stopped a GMC vehicle "two months" after "a concerned citizen . . . connected a particular residence — and a vehicle like the GMC —

---

[2] The State contends "[w]hile Detective Sheppard affirmed on cross that the purpose of wanting a stop was so Platania could conduct a K-9 sniff, this is inconsistent with Detective Day's and Sheppard's radio communications with Detective Sergeant Ramos, who[] suggested that Ramos conduct the stop instead." However, this is misleading, as the recordings captured Ramos stating, "I'm going to have [the] canine do the stop."

A-0025-24

with drug deals." 253 N.J. at 172. The following month, a CI told police the defendant "previously utilized the GMC for drug distribution." Ibid. Prior to stopping the GMC, police surveilled the defendant "for forty-seven minutes before the stop" and saw him engage in behavior that "provided reasonable and articulable suspicion to stop the GMC." Ibid. After the stop, the driver denied consent to search the GMC, and a pat down of the defendant yielded no contraband. Ibid. "[P]olice then called the [K-9] unit to conduct a [K-9] sniff of the GMC to establish probable cause to search the vehicle for drugs." Ibid. (emphasis added).

The Court concluded, "[t]hose combined circumstances, which together gave rise to probable cause, can hardly be characterized as unforeseeable." Ibid. The Court reasoned even though police were "not one hundred percent certain," they "reasonably anticipated and expected they would find drugs in the GMC." Ibid. The Court noted police "invested almost two hours investigating, surveilling, and utilizing five officers." Ibid. Further, police "made the decision to conduct a canine sniff to transform their expectations into probable cause to support a search." Id. at 173.

The Court in Smart also concluded "the circumstances giving rise to probable cause were anything but spontaneous; that is, they did not develop, for

14

example, suddenly or rapidly." Ibid. Instead, the Court found "the circumstances unfolded over almost two hours while investigating long-held information from a CI that defendant had utilized the GMC for drug trafficking." Ibid. Addressing the canine sniff, the Court was persuaded that police tool "was just another step in a multi-step effort to gain access to the vehicle to search for the suspected drugs." Ibid.

The facts of the present case are substantially similar to Smart. Although the surveillance here was shorter and arose from an investigation initially directed at a different subject, it preceded "a multi-step effort to gain access to the vehicle to search for the suspected drugs." Id. at 173. The record establishes directly, through Ramos's own words captured on the radio communications and Sheppard's testimony, the traffic stop existed for the sole purpose of enabling the narcotics sniff, and the decision to conduct that sniff was made before the traffic infraction occurred. The trial court's finding that the K-9 was initially called to assist with a resisting suspect, not to conduct a drug sniff, is unsupported by the record. While Platania testified he initially deployed K-9 Agir for apprehension purposes upon observing defendant resist, that does not account for the undisputed evidence the K-9 was directed to be present at the stop before it occurred for the express purpose of conducting a narcotics sniff.

15

Although it is true the detectives did not have probable cause to search the vehicle well in advance of the warrantless search, the Smart Court explained "the Alston/Witt test . . . requires not just that probable cause not exist long in advance of the search, but that it 'aris[e] from unforeseeable and spontaneous circumstances.'" Smart, 253 N.J. at 174 (quoting Witt, 223 N.J. at 450). The record demonstrates the probable cause here, derived from the K-9 sniff, did not arise from unforeseeable and spontaneous circumstances. The detectives "made the decision to conduct a canine sniff to transform their expectations into probable cause to support a search." Id. at 173. Furthermore, there was nothing preventing the officers from obtaining a warrant: defendant's car was parked in a residential lot, defendant was handcuffed, and his keys were in police custody when probable cause arose. There was no risk of evidence destruction and no officer-safety concern of the kind a roadside encounter presents. A warrant was required before searching the Chevy.

Reversed and remanded for proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Hanley*

Clerk of the Appellate Division